**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

| | | |
|---|---|---|
| DAVID SHURKIN, Derivatively on Behalf of THE ST. JOE COMPANY, | ) ) ) | CASE NO. _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| BRUCE R. BERKOWITZ, CHARLES J. CRIST, HUGH M. DURDEN,  THOMAS A. FANNING, CHARLES M. FERNANDEZ, HOWARD S. FRANK, DELORES M. KESLER, THOMAS P. MURPHY, WILLIAM BRITTON GREENE, WILLIAM S. MCCALMONT and JANNA L. CONNOLLY, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| THE ST. JOE COMPANY, | ) ) | |
| Nominal Defendant. | ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff, by his undersigned attorneys, brings this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant, The St. Joe Company ("St. Joe" or the "Company"), against certain directors and officers of St. Joe named herein. Plaintiff asserts the following allegations upon knowledge as to his own acts, and on information and belief (including the investigation of counsel and the review of publicly available information) as to all other allegations following due investigation.

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by shareholders of St. Joe on behalf of the Company against certain of its officers and directors seeking remedy for defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred between **August 4, 2009 and July1, 2011** (the "relevant period").  As alleged herein, defendants' improper course of conduct has resulted in hundreds of millions of dollars in losses to St. Joe, the potential for liability under state and federal law, a formal inquiry by the U.S. Securities & Exchange Commission ("SEC"), and irreparable damage to its goodwill, reputation, and standing in the business community.

2.      St. Joe is one of the largest real estate development companies and private landowners in Florida.  The Company engages primarily in the following four operating segments: (i) residential real estate; (ii) commercial real estate; (iii) rural land sales; and (iv) forestry.[1]  In its 2010 Annual Report, St. Joe's real estate holdings were estimated at 574,000 acres, primarily concentrated in the Northwest region of Florida.  According to defendants, as of December 31, 2010, its investment in real estate was valued at **over $755 million**.

3.      In fact, however, throughout the relevant period, defendants endorsed and/or made, or caused the Company to make, a series of materially false or misleading statements, or omitted to

---

[1] The residential real estate segment develops mixed-use resorts, and seasonal and primary residential communities. It also focuses on selling undeveloped land to third-party developers or investors. This segment serves individual purchasers, as well as national, regional, and local homebuilders. The commercial real estate segment develops and sells real estate primarily for commercial and light industrial uses. The rural land sales segment markets parcels for rural, recreational, conservation, and timberland uses. The forestry segment grows, harvests, and sells timber and wood fiber; and provides land management services for conservation properties.

disclose material information regarding the actual value, and financial state, of the Company's residential real estate development projects.

4.     Specifically, defendants endorsed and/or made, or caused the Company to make a series of materially false and/or misleading statements or omitted to disclose material information relating to the declining Florida real estate market, or that defendants failed to maintain adequate internal controls within St. Joe which resulted in defendants failing to take necessary impairments and important accounting write-downs on many of the Company's Florida-based properties. As a result, throughout the relevant period, defendants caused St. Joe's financial statements to be materially overstated, with a serious overvaluation of the Company's real estate holdings. Moreover, because defendants caused the Company to lack the necessary accounting controls, the defendants were allowed to cause the Company to publish a series of quarterly financial statements in violation of the Generally Accepted Accounting Principles ("GAAP").

5.     It was only beginning on October 13, 2010, however, that investors began to learn the truth about the Company after David Einhorn ("Einhorn"), a hedge fund manager at Greenlight Capital, Inc., appeared at the Value Investing Congress in New York, where he presented a 139-page exposition following which he characterized St. Joe as, essentially, "a $2 billion company whose market value exceeds the deserted swampland it owns." In slides showing the depressed values of Florida real estate and land, Einhorn said bluntly: *"JOE's business has essentially stopped," and that the Board of St. Joe had not properly accounted for those lands in financial statements.*

6.     During that presentation Einhorn stated that St. Joe needed to take "substantial impairments" and accounting write-downs on many of its properties. Einhorn went on to say that St. Joe is "way, way, overvalued" and that if the Company was caused to continue to build, its stock price would be driven to zero. Einhorn described the St. Joe community of Windmark

("Windmark") as his "favorite example" and described the property as "a ghost town."  Einhorn went on to point out that St. Joe had valued the Windmark property at a generous $164.5 million on its balance sheet; whereas Einhorn would only have "generously" valued the same property at $17.8 million.

7.     Einhorn's presentation focused entirely on defendants' overvaluations of the properties held in the Company's Florida real estate portfolio.  This report had an immediate impact upon the price of Company shares.   As evidence of this, *The Wall Street Journal* reported that "within minutes of Einhorn speaking St. Joe shares tanked.  At a glance they're down 10.4% to $21.98."  The next trading day, Company shares continued to decline, falling an additional $2.42 per share, or another 10.9%, to close at $19.74 per share.  Over the course of two trading days following Einhorn's assessment of St. Joe, the Company's share price dropped $4.80 per share, or over 19.5%.

8.     In addition to the foregoing, on January 11, 2011, the Securities and Exchange Commission ("SEC") announced that it was launching an "inquiry" into how St. Joe is caused to value its real estate assets, following allegations that the Company is overvaluing its real estate properties.   Thereafter, however, in early July 2011, shares of the Company collapsed again - - immediately falling almost 10% - - after defendant Berkowitz revealed that, a week earlier, the SEC had notified St. Joe that it had stepped-up its inquiry and was then "formally investigating" the Company.   Shares of St. Joe immediately declined $1.90 per share, or 9.1 percent, to $18.97.  For the Company, this amounted to the biggest drop in its share price since October 14, 2010, when Einhorn originally attacked the basis of defendants' accounting for St. Joe's assets.   As a result of this decline, shares of the Company were then down 13 percent for the year, compared with a 6.8 percent **increase** by the Russell 1000 Index.

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. All Defendants are completely diverse from Plaintiff and the amount in controversy exceeds $75,000.00.

10.     The Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (i) one or more of the Defendants either resides in or maintains executive offices here; (ii) a substantial portion of the transactions and wrongs complained of herein occurred here; and (iii) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

**Plaintiff**

12.     Plaintiff, David Shurkin, is and was during the Relevant Period an owner and holder of St. Joe common stock. Plaintiff is a citizen of New Jersey.

**Nominal Defendant**

13.     Nominal Defendant, The St. Joe Company, is a corporation organized under the laws of the State of Florida, which maintains its principal place of business at 133 South WaterSound Parkway, WaterSound, Florida 32413.   According to the Company's profile, listed on the finance page at yahoo.com:

The St. Joe Company, together with its subsidiaries, operates as a real estate development company in Florida. The company operates in four segments: Residential Real Estate, Commercial Real Estate, Rural Land Sales, and Forestry…. As of December 31, 2009, the company owned approximately 577,000 acres of land concentrated primarily in northwest Florida, as well as approximately 405,000 acres in the coast of the Gulf of Mexico….

**Individual Defendants**

14.     Defendant **BRUCE R. BERKOWITZ** ("Berkowitz") is the Chairman of the Board of Directors, having held that position since March 4, 2011, and has been a member of the Board of Directors since re-joining the Company on February 25, 2011, in connection with his agreement to forego his proxy contest that would have sought to remove the entire St. Joe Board.  Prior to re-joining the St. Joe Board, defendant Berkowitz had previously served as a director of the Company from January 1, 2011, until he quit on February 14, 2011 - - at the time he announced that he would begin a process to replace the existing Board.  Defendant Berkowitz is Chairman of the Executive Committee of the Board of Directors of the Company.  Defendant Berkowitz is also the Founder, Managing Member, and Chief Investment Officer of Fairholme Capital Management, and President and a Director of Fairholme Funds, Inc. (referred to collectively herein as "Fairholme"). Throughout the Relevant Period, Fairholme was the largest single investor in St. Joe and owned and/or controlled just under 30% of the Company's shares outstanding.  Defendant Berkowitz is a citizen of Florida.

15.     Defendant **CHARLES J. CRIST** ("Crist") was nominated to, and joined the St. Joe Board in connection with defendant Berkowitz' agreement to forego his proxy contest, on or about February 25, 2011.   While defendant Crist does not appear to have any prior experience managing public or private companies, he did have a long and distinguished career as a public servant, having served as the 44th Governor of the State of Florida, from 2007 to 2011, as the Attorney General of Florida, from 2003 to 2007, and as the Education Commissioner of Florida, from 2001 to 2003.

Defendant Crist also served as a Senator in the Florida Senate.  Governor Crist is currently an attorney with the law firm of Morgan & Morgan.  Defendant Crist is also Chairman of the Corporate Governance and Nominating Committee of the St. Joe Board and a member of its Compensation Committee.  Defendant Crist does not own any shares of the Company, and is a citizen of Florida.

16.     Defendant **HUGH M. DURDEN** ("Durden") is, and has been a Director of the Company since 2000, Chairman of the Board, from 2008 to 2011, and as Lead Director of the Board, from 2003 to 2008.  Defendant Durden also served as interim Chief Executive Officer of the Company from March to June 2011, and is not deemed independent by the Company as a result thereof.  During the relevant period, defendant Durden also served as a member of the St. Joe Board's Compensation Committee and as Chairman of its Governance and Nominating Committee. Currently, defendant Durden serves as a member of the Board's Executive Committee.   After having served at the Company for over a decade, defendant Durden owns only approximately 34,000 St. Joe shares, and he is a citizen of Florida.

17.     Defendant **THOMAS A. FANNING** ("Fanning") is, and has been a member of the Board of Directors of the Company since 2005.   During the relevant period, defendant Fanning served as a member of the Audit and Finance Committee of the St. Joe Board, and as a member of its Compensation Committee.  Defendant Fanning is also the Chairman, President and Chief Executive Officer of The Southern Company, and had previously served as its Executive Vice President and Chief Financial Officer, from 2003 through 2007, and had previously held other management positions with The Southern Company and its affiliates since 1980, including serving as Chief Executive Officer of Gulf Power Company, from 2002 to 2003, and Chief Financial Officer of Georgia Power Company, from 1999 to 2002.  During the relevant period, defendant Fanning, through two subsidiaries owned and operated by the Southern Company, sold land options and wet

land mitigation credits to St. Joe.  Defendant Fanning holds approximately 23,000 St. Joe shares, and he is a citizen of Georgia.

18.     Defendant **CHARLES M. FERNANDEZ** ("Fernandez") is, and has been a member of the Board of Directors of St. Joe since re-joining the Company on February 25, 2011, in connection with defendant Berkowitz' agreement to forego his proxy contest, intended to replace the entire Board.  Defendant Fernandez currently serves as Vice-Chairman of the Board of Directors of the Company.  Prior to re-joining the St. Joe Board, defendant Fernandez had previously served on the Board from January 1, 2011, until he quit on February 14, 2011 - - at the time he announced that he, Berkowitz and Fairholme would begin a process to replace the then existing Board.  Defendant Fernandez is a member of the Executive Committee and of the Compensation Committee of the Board of Directors of the Company.  Defendant Fernandez is also President of Fairholme Capital Management, and Vice President and a Director of the Fairholme Fund.  Defendant Fernandez does not personally own any shares of the Company, and he is a citizen of Florida.

19.     Defendant **HOWARD S. FRANK** ("Frank") is, and has been a member of the Board of Directors of St. Joe since joining the Company on February 25, 2011, in connection with defendant Berkowitz' agreement to forego his proxy contest, intended to replace the entire Board. Defendant Frank currently serves as Chairman of the Audit and Finance Committee of the Board of Directors of the Company, and as a member of its Governance and Nominating Committee. Defendant Frank is also a member of the board of directors of Fairholme Funds, and is Chief Operating Officer and Vice Chairman of the board of directors of Carnival Corporation, having served in various capacities at Carnival since 1998.  Defendant Frank owns no shares of the Company, and he is a citizen of Florida.

20.     Defendant **DELORES M. KESLER** ("Kesler") is, and has been a member of the Board of Directors of the Company since 2004.   Now, as well as throughout the relevant period, defendant Kesler served as a member of the Compensation Committee (currently Chair) and as a member of the Audit and Finance Committee of the Board of Directors.  Defendant Kesler currently owns less than 20,000 shares of St. Joe common stock, and she is a citizen of Florida.

21.     Defendant **THOMAS P. MURPHY, JR.,** ("Murphy") is a member of the Board of Directors of the Company, having been elected to that position on or about May 17, 2011. Defendant Murphy is a member of the Corporate Governance and Nominating Committee of the Board of St. Joe.  Defendant Murphy is also Chairman and Chief Executive Officer of Coastal Construction Group, a construction company, which he founded in 1989.   Coastal Construction Group was a campaign contributor to defendant Crist.  Defendant Murphy owns no shares of the Company, and he is a citizen of Florida.

22.     Defendant **WILLIAM BRITTON GREENE** ("Greene") was, during the relevant period, St. Joe's President, from October 2007, its Chief Executive Officer, from May 2008, and as a director from 2008, and held those positions until he was thrown out of the Company in exchange for defendant Berkowitz's agreement to forego his proxy contest intended to remove the remainder of the St. Joe Board, on or about February 25, 2011.  Defendant Greene also served as the Company's Chief Operation Officer, from August 2006 until May 2008, and held various other administrative positions within the Company, including President of St. Joe Commercial, St. Joe Towns & Resorts, and West Florida, and Vice President of West Florida Residential and Resort Operations.  During the relevant period, while serving as CEO and President of the Company and while in possession of material non-public information about St. Joe, defendant Greene sold over

123,000 shares of his privately held St. Joe shares to realize illicit gross proceeds of over $3.413 million.  Defendant Greene is a citizen of Florida.

23.     Defendant **WILLIAM S. MCCALMONT** ("McCalmont") was, during the relevant period, Chief Financial Officer of the Company, since May 2007, and Executive Vice President of the Company, since January 2009, until such time as he announced his unscheduled departure from St. Joe, on or about May 20, 2011.  During the relevant period, and while in possession of material non-public information about the Company, defendant McCalmont sold over 63,000 shares of his privately held St. Joe stock to realize illicit gross proceeds of over $1.757 million. Defendant McCalmont is a citizen of Florida.

24.     Defendant **JANNA L. CONNOLLY** ("Connolly") was, throughout the relevant period, Senior Vice President and Chief Accounting Officer of the Company, having held those positions since 1996.   Following the unscheduled departure of defendant McCalmont from the Company, on or about May 21, 2011, defendant Connolly assumed the position as Chief Financial Officer of St. Joe.   During the relevant period, while in possession of material non-public information about the Company, defendant Connolly sold over 27,000 shares of Company stock to realize illicit gross proceeds of over $800,000. Defendant Connolly is a citizen of Florida.

25.     The defendants referenced above in ¶¶ 14 - 24 are referred to herein as the "Individual Defendants."

26.     The defendants referenced above in ¶¶ 14 - 21 are referred to herein as the "Director Defendants."

## GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

27.     Each of the Individual Defendants had stringent fiduciary obligations to St. Joe and its shareholders.  By reason of their positions as officers, directors and/or fiduciaries of St. Joe and because of their ability to control the business and corporate affairs of St. Joe, the defendants owed

St. Joe and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage St. Joe in a fair, just, honest and equitable manner.  The defendants were and are required to act in furtherance of the best interests of St. Joe and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owed and continues to owe to St. Joe and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held Company, the  defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, asset valuations and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

29.     Defendants, because of their positions of control and authority as directors and/or officers of St. Joe, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with St. Joe, each defendant had access to adverse, non-public information about the financial condition, operations, and improper representations of St. Joe.

30.     At all times relevant hereto, each defendant was the agent of each of the other defendants and of St. Joe, and was at all times acting within the course and scope of such agency.

31.     To discharge their duties, the officers and directors of St. Joe were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of

the operational affairs of the Company.  By virtue of such duties, the officers and directors of St. Joe were required to, among other things:

(a)     refrain from acting upon material, inside, corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, complying with Generally Accepted Accounting Principles ("GAAP"), and disseminating truthful and accurate statements to the SEC and shareholders;

(c)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(d)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     ensure that the Company's financial statements were based on appropriate support and documentation, and were routinely checked for accuracy;

(f)     ensure that financial records could not be manipulated;

(g)     ensure that the stated values of the Company's real estate holdings are accurate and that the valuation models used are adequate and effective.

(h)     remain informed as to how St. Joe conducted its operations, and upon receipt of notice or information imprudent or unsound conditions or practices, to make reasonable inquiry in

12

connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws:

        (i)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

        (j)     ensure that these were sufficient checks and balances in St. Joe's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue or asset values; and

        (k)     ensure that no inaccurate financial information about St. Joe was released to the public that would tend to artificially inflate St. Joe's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

        32.     Each of defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of St. Joe, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.  Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of defendants who were also officers and/or directors of the Company during the relevant period have been ratified by the remaining defendants who collectively comprised all of St. Joe's Board during the relevant period.

        33.     In addition, defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing,

summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

34.     Defendants breached their duties of loyalty and good faith by allowing, or by themselves causing, St. Joe to disregard repeated failures of the Company's accounting policies and procedures which lead to the grossly overstated real estate holdings on the Company's balance sheet, misleading the Company's shareholders.  In addition, defendants caused St. Joe to file false and/or misleading quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional shareholders, which harmed all shareholders including Plaintiff. Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and the opportunity, in their capacity as directors/officers of St. Joe, to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, St. Joe, through the defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result of defendant's illegal actions and course of conduct during the Relevant Period, the Company is now subject to class action lawsuits that allege violations of both federal and state law.  As a result, St. Joe has expended, and will continue to expend, significant sums of money.

## SPECIFIC FIDUCIARY DUTIES OF DEFENDANTS

### Duties Defined in St. Joe's Code of Business Conduct

35.     In addition to the general duties summarized above, the Company's Code of Conduct and the charters of the individual Board committees also imposed specific duties on the Individual Defendants.  As evidence of this, St. Joe's Code of Conduct requires that each member of the Company's management, its executives and its directors, imposes the following duties, among others:

- It is the policy of The St. Joe Company and its subsidiaries (the "Company") that our *business shall be conducted in accordance with the highest legal and ethical standards*. Our reputation for integrity is our most important asset and each employee and member of the Board of Directors must contribute to the care and preservation of that asset.

- Each employee shares this responsibility with senior management and the Board of Directors and must help maintain the *integrity of the Company's financial records*. We trust that every employee understands that protecting the integrity of our public disclosures is one of the highest priorities we have as a company.

- *It is unlawful for any officer or director of the Company*, or any other person acting under the direction of such person, *to take any action to fraudulently influence, coerce, manipulate, or mislead the independent accountants* engaged in the performance of an audit of the Company's financial statements for the purpose of rendering such financial statements materially misleading.  Any such action is a violation of law and of this Code of Conduct.

- Any employee or director who engages in such conduct will be subject to sanctions under the Code, including dismissal in the case of an employee, in addition to potential civil and criminal liability.

- *Accurate business records are relied upon* by our employees, customers, tenants, suppliers, subcontractors, shareholders and by various government agencies. Therefore, our books, records and accounts (whether computerized, paper or other) must fully and accurately reflect our business transactions.  *These include financial statements*, accounting records, time sheets, vouchers, bills, invoices, expense reports, payroll and benefits records, performance evaluations, and other essential Company data.  Financial, accounting and related records must be entered in reasonable detail, in accordance with approved accounting practices.  No false or misleading entries or failure to make required entries will be permitted for any reason.

- ***Applicable laws of every jurisdiction in which the Company operates must be followed***, including environmental, health and safety laws.  Each employee is charged with the responsibility of acquiring sufficient knowledge of the laws relating to his or her particular duties in order to recognize potential dangers and to know when to seek legal advice.  In any instance where the law is ambiguous or difficult to interpret, the matter should be reported to the Company's management who, in turn, will seek legal advice from the Company's legal counsel as appropriate.

- If an actual or potential conflict of interest arises for a director, the director must promptly notify the Chairman of the Governance and Nominating Committee of the Board and the Compliance Officer.  The Board of Directors will resolve any conflict of interest question involving a director.  All directors will excuse themselves from any decision affecting their personal, business or professional interests.  If a significant conflict exists and cannot be resolved, the director should resign from the Board of Directors.  [Emphasis added.]

### Duties of the Audit and Finance Committee

36.     In addition to the Company's Code of Conduct, the members of the Audit and Finance Committee were and are also subject to additional duties as a result of their participation on this Committee.  The members of the Audit Committee of the Board of Directors of the Company include, defendant Frank (Chair) and defendants Fanning and Kessler.  Primarily these duties relate to the financial oversight of the Company and the publication of its financial statements.  This Committee also assists the Board in fulfilling its responsibility to oversee: (i) management's conduct of the financial reporting process; (ii) the quality and integrity of the Company's financial statement; (iii) the Company's compliance with legal and regulatory requirements; (iv) the independent auditors' qualifications and independence; (v) the Company's system of internal accounting controls; and (vi) the performance of the Company's internal audit function and independent auditors.  This Committee also prepares a Committee report required by SEC rules to be included in the Company's annual report.  The Audit and Finance Committee also monitors the present and future capital requirements of the Company, and reviews and provides guidance to the Board and management about all proposals concerning the major financial policies of the Company.

37.     In addition to the other Codes of Ethics and Conduct imposed by the Company or by law, the Charter of the Audit and Finance Committee also imposes upon the members of that Committee, in part, the following duties:

* ***Review and discuss with management earnings press releases, as well as financial information and earnings guidance provided*** to analysts and ratings agencies, it being understood that such discussions may, in the discretion of the Committee, be done generally (i.e., by discussing the types of information to be disclosed and the type of presentation to be made) and that the Committee need not discuss in advance each earnings release or each instance in which the Company gives earnings guidance.

* ***Review and discuss with management and the independent auditors the Company's internal control report*** and the independent auditor's attestation of the report prior to the filing of the Company's Annual Report on Form 10-K.

* Review and discuss with management and the independent auditors the responsibilities, budget and staffing of the Company's internal audit function and the planned scope of the internal audit. The Committee shall also review the results of internal audits and any significant reports to management prepared by the internal auditor, together with any management responses.

* ***Review and discuss with management and the independent auditors the Company's significant financial risks and exposures*** and the steps taken to monitor and minimize such risks, including any insurance policies and other policies with respect to risk assessment and risk management.

* Discuss with the Company's counsel any significant legal matters that may have a material effect on the Company's financial statements and the Company's compliance policies, including any material communications with governmental agencies.

* ***Review and discuss with management Company policies with respect to compliance with laws and regulations, ethics, conflicts of interest and the investigation of misconduct or fraud***, including the Company's Code of Conduct. The Committee shall obtain periodic reports from management regarding the Company's compliance with its policies and applicable legal requirements.

* ***Maintain and periodically review procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters***, including procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. The Committee shall periodically review with management and internal audit these procedures and any significant complaints received.

\*  Prepare any report or other disclosures, including any recommendations of the Committee, required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

\*  ***Review and provide guidance to the full Board and management regarding the Company's significant financial plans, policies or transactions***, including (a) policies relating to cash needs, shareholder distributions, share repurchases and investments; (b) adjustments to the capital structure; (c) the annual financial plan to be included as part of the annual business plan reviewed and approved by the Board; (d) tax planning and compliance; (e) proposed mergers, acquisitions, divestitures and strategic investments; (f) the spending authority approval process for officers and employees; and (g) other transactions or financial issues that management desires to have reviewed by the Committee.

\*  ***Report its actions to the Board on a regular basis*** and to make such recommendations with respect to the matters described in this Charter and other matters as the Committee may deem necessary or appropriate.

\*  Take such other actions and do such other things as may be referred to it from time to time by the Board.  [Emphasis added.]

**Duties of the Governance and Nominating Committee**

38.  The Governance and Nominating Committee of the Board of Directors of the Company currently includes defendant Crist (Chair), and defendants Frank and Murphy. The purpose of the Governance and Nominating Committee is to identify qualified individuals to become board members, determine the composition of the Board and its committees, develop a process to assess Board effectiveness, develop and implement the Company's corporate governance principles and policies, and otherwise take a leadership role in shaping the corporate governance of the Corporation.

39.  Accordingly, the Charter of the Governance and Nominating Committee also imposes specific additional duties upon its Committee members, including in part, the following:

- Develop and recommend to the Board for its approval a set of corporate governance principles. The Committee shall review the principles on an annual basis, or more frequently if appropriate, and recommend changes as necessary.

18

- Develop and recommend to the Board for its approval an annual evaluation process of the individual members of the Board, the full Board and its committees. The Committee shall oversee the annual evaluations and report the results to the Board.

- ***Review with the Company's counsel the Company's compliance with applicable laws and regulations***, inquiries received from regulators or governmental agencies and legal matters, to the extent they may involve misconduct or illegal or unethical behavior by corporate officers or directors.

- To the extent permitted by Florida law, review and recommend to the Board the Company's policies on and responses to important shareholder issues and proposals. [Emphasis added.]

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

41.      During the relevant period, defendants collectively and individually initiated a course of conduct that was designed to and did:  (i) cause the Company to maintain grossly inadequate accounting and other internal controls and procedures;  (ii) cause the Company to issue false and misleading results regarding the Company's financial performance despite an ailing real estate market; (iii) cause the Company to overstate the value of its real estate holdings; (iv) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (v) maintain defendants' executive and directorial positions at St. Joe and the profits, power and prestige that the Defendants enjoyed as a result of these positions; and (vi) deceive shareholders, including shareholders of St. Joe, regarding defendants' management of St. Joe's operations, the Company's financial health and stability, future business prospects, and accounting that were misrepresented by defendants throughout the relevant

period.  In furtherance of this plan, conspiracy and course of conduct, the defendants collectively and individually took the actions set forth herein.

42.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct and continuing thereafter regarding the improper statements regarding the financial performance and foreseeable profitability of St. Joe.  During this time, defendants caused the Company to conceal the true fact that St. Joe was being caused by defendants to issue material false and misleading statements regarding St. Joe's real estate holdings.  In addition, certain of the Individual Defendants also made other specific, improper statements about St. Joe's financial performance and future business prospects, including prospects for St. Joe's future growth and sustainability.

43.     The purpose and effect of defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the defendants' violations of law, including breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, and to conceal adverse information concerning the Company's future earnings outlook.

44.     Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly and grossly negligently misrepresent its financial results through St. Joe's operations.  Because the actions described herein occurred under the authority of the Board, and with the support of management, each of the defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

45.     Each defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the

wrongdoing complained of herein, defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

46.     Defendants, by their fiduciary duties of care, good faith, and loyalty, owe to St. Joe a duty to insure that the Company's public filings and statements fairly represent the operations and business prospects of the Company.   In order to adequately carry out these duties, it is necessary for defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements. Here, the material, non-public adverse information that defendants caused the Company to misrepresent and to omit to be disclosed principally concerned St. Joe's overstated real estate holdings.

47.     The Officer Defendants had ample opportunity to discuss this material information with his fellow officers at management meetings and *via* internal corporate documents and reports, and to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the relevant period, as well as at meeting of committees of the Board. Despite these duties, however, throughout the relevant period, defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the dissemination of materially false and misleading statements and operational reports to the investing public and the Company's shareholders, primarily through the publication of press releases and through the filing of reports with the SEC.

48.     As evidence of such materially false and misleading statements which defendants cased the Company to publish, on August 4, 2009, the inception of the relevant period, defendants

caused the Company to publish a release announcing purported results for the second quarter of 2009, ended June 30, 2009.  This release stated, in part, the following:

> Jacksonville, Florida - (August 4, 2009) - The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter 2009 of $(44.6) million, or $(0.49) per share, which includes pre-tax non-cash charges of $64.7 million, or $0.43 per share after tax.  This compares to a Net Loss of $(20.8) million, or $(0.23) per share, for the second quarter of 2008, which included significant charges of $35.3 million, or $0.24 per share after tax…

> \*   \*   \*

> Net Loss for the first half of 2009 was $(56.3) million, or $(0.62) per share, compared to Net Income of $11.2 million, or $0.13 per share, for the first half of 2008.

> Included in the results for the first six months of 2009 were the following significant non-cash charges:

> \*       Settlement charge on pension annuitization of $44.7 million, or $0.30 per share after-tax; and

> \*       Pre-tax impairment charges of $21.5 million, or $0.14 per share after-tax.

52.     Regarding the Company's liquidity and balance sheet performance, the August 4, 2009, release stated, in part, the following:

> **Liquidity and Balance Sheet**

> At June 30, 2009, JOE had cash of $116.6 million and pledged treasury securities of $28.0 million, compared to debt of $49.1 million, $28.0 million of which is defeased debt. JOE's $100 million line of credit remained undrawn at June 30, 2009.

> The pre-tax non-cash charge related to the annuitization of the pension plan liabilities did not impact tangible net worth as calculated for purposes of our line of credit covenants due to the offsetting credit to accumulated other comprehensive income. As a result of this transaction, JOE was able to significantly increase the pension plan's funded status ratio at June 30, 2009, thereby reducing the potential for future funding requirements.

> \*   \*   \*

> Capital expenditures for the second quarter this year were $9.4 million, compared to $31.6 million in the second quarter last year, a reduction of 70 percent. In addition,

JOE incurred cash overhead costs of $14.3 million during the quarter, compared to $21.5 million for the second quarter last year, a 33 percent reduction.

49.     In addition to the foregoing, the August 4, 2009 release, caused to be published by

defendants, also quoted defendants Greene and McCalmont, in part, as follows:

> "As a result of a slight uptick in the market in the second quarter, *we experienced positive results from our ongoing efforts to sell residential inventory* with closings in a number of our communities generating revenue of approximately $11.7 million," said Britt Greene, President and CEO of JOE.
>
> *     *     *
>
> "*With economic challenges unabated, we continue to take a very prudent approach as we manage our assets* and continue to reduce capital expenditures, as well as operating and overhead expenses," said William S. McCalmont, JOE's Executive Vice President and CFO. "*Because we have managed our balance sheet in a conservative manner, we now have the flexibility to execute our growth strategy as we begin to implement the initial development plans on our valuable land holdings near the new international airport*."
>
> *     *     *
>
> "In the coming quarters, our priority will be to take advantage of *the opening of the newest international airport in the country that is centered within some of JOE's most valuable land holdings*," said Greene. "We expect, over time, that this international airport will expand our customer base as it connects Northwest Florida with the global economy and the area is repositioned from a regional to a national destination. While we understand growth around the airport will ramp up over time, the JOE team is *keenly focused on implementing our strategy to maximize these great assets*."
>
> "During the second quarter, we initiated a significant outreach program to site consultants and multinational corporations, as well as their suppliers, within the aerospace, defense, security and aviation economic clusters," said Greene. "*With the airport opening now less than one year away, we are working to position several initial parcels near the airport to be 'revenue-ready'*." [Emphasis added.]

50.     As shares of St. Joe traded at levels artificially inflated as a result of defendants' false

and materially misleading statements, on August 4, 2009, defendants also caused the Company to

file with the SEC its 2Q:09 Form 10-Q, for the quarter ended June 30, 2009, signed by defendant

Greene, and certified by defendants Greene and McCalmont.  In addition to making substantially

similar statements concerning the Company operations, including asset values, expenses, costs, and ratios, as had been published previously, the 2Q:09 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

**Basis of presentation**

*The accompanying unaudited interim financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission* for reporting on Form 10-Q. Accordingly, certain information and footnotes required by U.S. generally accepted accounting principles for complete financial statements are not included herein. The consolidated interim financial statements include the accounts of the Company and all of its majority-owned and controlled subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The December 31, 2008 balance sheet amounts have been derived from the Company's December 31, 2008 audited financial statements.

*The statements reflect all normal recurring adjustments that, in the opinion of management, are necessary for fair presentation of the information contained herein*. The consolidated interim statements should be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2008. The Company adheres to the same accounting policies in preparation of its interim financial statements. As permitted under generally accepted accounting principles, interim accounting for certain expenses, including income taxes, are based on full year assumptions. For interim financial reporting purposes, income taxes are recorded based upon estimated annual effective income tax rates. [Emphasis added.]

51.     The Company's 2Q:09 Form 10-Q, caused to be filed with the SEC by defendants, also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

Item 4.     **Controls and Procedures**

(a)     Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. *Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this report, our disclosure*

*controls and procedures are effective in bringing to their attention on a timely basis material information relating to the Company* (including its consolidated subsidiaries) required to be included in the Company's periodic filings under the Exchange Act.

(b)     Changes in Internal Controls. During the quarter ended June 30, 2009, there were no changes in our internal controls that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting. [Emphasis added.]

52.     Regarding St. Joe's purported Consolidated Balance Sheet, the Company's 2Q:09 Form 10-Q was also caused to state, in part, the following:

### CONSOLIDATED BALANCE SHEETS
#### (Dollars in thousands)

| | June 30, 2009 (Unaudited) | December 31, 2008 |
|---|---|---|
| **ASSETS** | | |
| Investment in real estate | $ 869,750 | $  890,583 |
| Cash and cash equivalents | 116,569 | 115,472 |
| Notes receivable | 35,608 | 50,068 |
| Pledged treasury securities | 27,995 | 28,910 |
| Prepaid pension asset | 43,153 | 41,963 |
| Property, plant and equipment, net | 19,126 | 19,786 |
| Other intangible assets, net | 1,590 | 1,777 |
| Income taxes receivable | 46,993 | 32,308 |
| Other assets | 28,684 | 33,422 |
| Assets held for sale | — | 3,989 |
| Total assets | $1,189,468 | $ 1,218,278 |

53.     Regarding St. Joe's purported Investment in Real Estate, the Company's 2Q:09 Form 10-Q was also caused to state, in part, the following:

**Investment in Real Estate**

Real estate by segment includes the following:

| | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Operating property: | | |
| Residential real estate | $   193,369 | $     185,798 |
| Rural land sales | 139 | 139 |
| Forestry | 62,287 | 62,435 |
| Other | 510 | 338 |
| **Total operating property** | 256,305 | 248,710 |
| Development property: | | |
| Residential real estate | 571,728 | 596,011 |
| Commercial real estate | 59,316 | 59,045 |
| Rural land sales | 7,721 | 7,381 |

| | | |
|---|---:|---:|
| Other | 305 | 796 |
| **Total development property** | 639,070 | 663,233 |
| Investment property: | | |
| Commercial real estate | 1,753 | 1,835 |
| Rural land sales | 5 | 5 |
| Forestry | 523 | 522 |
| Other | 5,906 | 5,742 |
| **Total investment property** | 8,187 | 8,104 |
| Investment in unconsolidated affiliates: | | |
| Residential real estate | 2,943 | 3,494 |
| Total real estate investments | 906,505 | 923,541 |
| Less: Accumulated depreciation | 36,755 | 32,958 |
| **Investment in real estate** | $ 869,750 | $ 890,583 |

Included in operating property are Company-owned amenities related to residential real estate, the Company's timberlands and land and buildings developed by the Company and used for commercial rental purposes. Development property consists of residential real estate land and inventory currently under development to be sold. Investment property primarily includes the Company's land held for future use.

54.      Regarding the Company's purported Review of Long-lived Assets and necessary asset write-downs during the quarter, the 2Q:09 Form 10-Q was caused to state, in part, the following:

*The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.* The fair value of homes and homesites is determined based upon final sales prices of inventory sold during the period (level 2 inputs). *For inventory held for sale, estimates of selling prices based on current market data are utilized* (level 3 inputs). For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (level 3 inputs).

*The Company's assets measured at fair value on a nonrecurring basis are those assets for which the Company has recorded valuation adjustments and write-offs during the current period.* The assets measured at fair value on a nonrecurring basis are as follows:

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Fair Value June 30, 2009 | Total Losses |
|---|---:|---:|---:|---:|---:|
| Non-financial assets: | | | | | |
| Investment in real estate | $ — | $ 2,900 | $ 24,000 | $ 26,900 | $12,142 |

In accordance with the provisions of SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* , long-lived assets sold or held for sale with a carrying amount of $39.0 million were written down to their fair value of $26.9 million, resulting in a loss of $12.1 million, which was included in impairment losses for the three months ending June 30, 2009. ***The Company recorded impairment charges of $0.2 million during the three months ended June 30, 2008 and $12.4 million and $2.4 million during the six months ended June 30, 2009 and 2008, respectively***. [Emphasis added.]

55.     In connection with the 2Q:09 Form 10-Q, Defendants Greene and McCalmont also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), certifying that they had reviewed the form 2Q:09 10-Q, and, *inter alia*:

(a)     The "***report does not contain any untrue statement of a material fact or omit to state a material fac*t** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;"

(b)     The "financial statements, and other financial information included in this report, ***fairly present in all material respects*** the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;"

(c)     ***Defendants had "Designed such disclosure controls and procedures***, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures*** and presented in this report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;" and

(d)      *Have "disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): (a) *All significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) *Any fraud,* whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." [Emphasis added.]

56.      Also, pursuant to Section 906 of SOX, defendants Greene and McCalmont certified that: (i) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and that, (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

57.      As shareholders ultimately learned, however, the statements caused to be made by defendants, on behalf of the Company, and contained in the Company's August 4, 2009, release and in the Company's 2Q:09 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)      At all times during the relevant period, it was not true that the Company was operating according to its development plans or that the Company had properly valued its real estate assets to reflect the impairment of its holdings, in line with the recent decline in the value of Florida real estate;

(b)      At all times during the relevant period, unbeknownst to investors, defendants had materially overstated the Company's profitability and understated its costs by failing to properly account for the Company's asset impairments and by failing to properly value the Company's residential real estate, residential amenities, commercial real estate, and undeveloped real estate, and by failing to take material asset impairment charges related thereto;

(c)      Throughout the relevant period, it was also not true that St. Joe contained adequate systems of internal operational or financial controls, such that St. Joe's reported financial statements were true, accurate or reliable;

(d)      As a result of the foregoing, throughout the relevant period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules; and

(e)      As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the relevant period, defendants lacked any reasonable basis to claim that St. Joe was operating according to plan, or that St. Joe could achieve guidance sponsored and/or endorsed by Defendants.

58.      On November 3, 2009, defendants also caused the Company to publish a release, announcing purported results for the third quarter of 2009, ended September 30, 2009.  This release stated, in part, the following:

> Jacksonville, Florida - (November 3, 2009) - The St. Joe Company (NYSE: JOE) today announced a Net Loss for the third quarter of 2009 of $(14.4) million, or

$(0.16) per share, which included pre-tax charges of $12.9 million, or $0.08 per share after tax.  This compares to a Net Loss of $(19.2) million, or $(0.21) per share, for the third quarter of 2008, which included pre-tax charges of $13.0 million, or $0.09 per share after tax….

St. Joe's third quarter earnings included $11.1 million of pre-tax, non-cash impairment charges including $9.0 million related to the settlement of the Saussy Burbank notes receivable, $2.0 million associated with various homes, homesites and other long-term assets and $0.1 million related to various builder notes receivable.  The Company also incurred a restructuring charge of $1.8 million related to one-time termination benefits.

**Third Quarter Highlights:**

- Sold 5.6 acres of commercial land for $2.1 million, or over $350,000 per acre.

- Generated $9.2 million of revenue from the sale of 47 residential homes and homesites, including substantially all of the remaining condominium units at Artisan Park in Celebration, Florida.

- Completed the sale of the SevenShores condominium project in Bradenton, Florida.

- Received federal tax refunds totaling more than $32 million in cash.

- Increased the Company's cash position by $40.0 million and reduced debt by $5.8 million.

- Hired a vice president - economic development to focus on commercial development opportunities within the West Bay Sector.

59.    Regarding the Company's liquidity and balance sheet performance, the November 3, 2009, release was also caused to state, in part, the following:

**Liquidity and Balance Sheet**

At September 30, 2009, St. Joe had cash of $156.6 million and pledged treasury securities of $27.5 million, compared to debt of $43.3 million, $27.5 million of which is defeased debt.  The Company's $100 million revolving credit facility remained undrawn at September 30, 2009.

During the third quarter, St. Joe's cash position increased primarily due to the receipt of federal tax refunds totaling over $32 million.  Also during the third quarter, the Company's debt was reduced by $5.8 million primarily as a result of the sale of the

SevenShores project.

\* \* \*

Capital expenditures for the first nine months of 2009 were $10.9 million, compared to $28.9 million for the same period in 2008, a reduction of 62 percent.  In addition, *St. Joe incurred cash overhead costs of $45.5 million for the first nine months of 2009, compared to $65.8 million for the same period last year, a 31 percent reduction.* [Emphasis added.]

60.     In addition to the foregoing, the November 3, 2009 release also quoted defendants Greene and McCalmont, in part, as follows:

> "*During the third quarter, we continued to make progress in our efforts to stimulate demand for our land in Northwest Florida* with an emphasis on our land proximate to the new international airport," said St. Joe's President and CEO Britt Greene.  "The addition of a vice president of economic development and, of course, Southwest Airlines' game-changing announcement of planned service to the new airport will help to create value for our shareholders for many years to come."
> \* \* \*
> "Now that the most successful airline in the country will serve the new international airport, we are accelerating our outreach efforts with site consultants and customers about opportunities to utilize our lands," said Greene.  "The 'Southwest Effect' will give these users more reason to seriously consider expanding their businesses in our region."
>
> \* \* \*
>
> "*During the quarter we continued to refine our focus*, including the sale of non-strategic Central Florida assets, enhancing our financial flexibility as we prepare for the opportunities created by the opening of the new international airport in Northwest Florida," stated William S. McCalmont, St. Joe Executive Vice President and CFO. [Emphasis added.]

61.     As shares of St. Joe traded at levels artificially inflated as a result of defendants' false and materially misleading statements, on November 3, 2009, defendants caused the Company to also file with the SEC the Company's 3Q:09 Form 10-Q, for the quarter ended September 30, 2009, signed by defendant Greene, and certified by defendants Greene and McCalmont.  In addition to making substantially similar statements concerning the Company operations, including asset values, expenses, costs, and ratios, as had been published previously, the 3Q:09 Form 10-Q also provided

statements concerning the Company's Significant Accounting Policies and the Basis of its

Accounting Presentation, in part, as follows:

**Basis of Presentation**

*The accompanying unaudited interim financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission for reporting on Form 10-Q.* Accordingly, certain information and footnotes required by U.S. generally accepted accounting principles for complete financial statements are not included herein. The consolidated interim financial statements include the accounts of the Company and all of its majority-owned and controlled subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The December 31, 2008 balance sheet amounts have been derived from the Company's December 31, 2008 audited financial statements.

*The statements reflect all normal recurring adjustments that, in the opinion of management, are necessary for fair presentation of the information contained herein.* The consolidated interim statements should be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2008. The Company adheres to the same accounting policies in preparation of its interim financial statements. As permitted under generally accepted accounting principles, interim accounting for certain expenses, including income taxes, are based on full year assumptions. For interim financial reporting purposes, income taxes are recorded based upon estimated annual effective income tax rates.  [Emphasis added.]

62.    The Company's 3Q:09 Form 10-Q was also caused to contain representations which

attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as

follows:

Item 4.        Controls and Procedures

(a)    Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Company's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. *Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective in bringing to their attention on a timely basis material information relating to the Company* (including its consolidated subsidiaries) required to be included in the Company's periodic filings under the Exchange Act.

(b)      Changes in Internal Controls. During the third quarter of 2009, there were no changes in our internal controls that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting. [Emphasis added.]

63.      Regarding its' purported Consolidated Balance Sheet, the Company's 3Q:09 Form 10-Q was caused to state, in part, the following:

## CONSOLIDATED BALANCE SHEETS
### (Dollars in thousands)

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| Investment in real estate | $ 844,911 | $ 890,583 |
| Cash and cash equivalents | 156,554 | 115,472 |
| Notes receivable | 25,268 | 50,068 |
| Pledged treasury securities | 27,547 | 28,910 |
| Prepaid pension asset | 42,193 | 41,963 |
| Property, plant and equipment, net | 16,899 | 19,786 |
| Income taxes receivable | 27,881 | 32,308 |
| Other assets | 28,754 | 35,199 |
| Assets held for sale | — | 3,989 |
| Total assets | $ 1,170,007 | $ 1,218,278 |

64.      Regarding its' purported Investment in Real Estate, the Company's 3Q:09 Form 10-Q was caused to state, in part, the following:

**4.      Investment in Real Estate**

Real estate by segment includes the following:

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Operating property: | | |
| Residential real estate | $ 192,173 | $ 185,798 |
| Rural land sales | 139 | 139 |
| Forestry | 62,042 | 62,435 |
| Other | 510 | 338 |
| **Total operating property** | 254,864 | 248,710 |
| Development property: | | |
| Residential real estate | 549,559 | 596,011 |
| Commercial real estate | 59,531 | 59,045 |
| Rural land sales | 7,721 | 7,381 |
| Other | 305 | 796 |
| **Total development property** | 617,116 | 663,233 |
| Investment property: | | |
| Commercial real estate | 1,753 | 1,835 |
| Rural land sales | 5 | 5 |
| Forestry | 523 | 522 |
| Other | 5,906 | 5,742 |

| | | | | |
|---|---|---|---|---|
| **Total investment property** | | 8,187 | | 8,104 |
| Investment in unconsolidated affiliates: | | | | |
| Residential real estate | | 2,877 | | 3,494 |
| Total real estate investments | | 883,044 | | 923,541 |
| Less: Accumulated depreciation | | 38,133 | | 32,958 |
| **Investment in real estate** | $ | 844,911 | $ | 890,583 |

Included in operating property are Company-owned amenities related to residential real estate, the Company's timberlands and land and buildings developed by the Company and used for commercial rental purposes. Development property consists of residential real estate land and inventory currently under development to be sold. Investment property primarily includes the Company's land held for future use.

65.  Regarding defendants' purported review of the Company's long-lived assets and necessary asset write-downs during the quarter, the 3Q:09 Form 10-Q was caused to state, in part, the following:

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. The fair value of homes and homesites is determined based upon final sales prices of inventory sold during the period (level 2 inputs). For inventory held for sale, estimates of selling prices based on current market data are utilized (level 3 inputs). For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (level 3 inputs).

The Company's assets measured at fair value on a nonrecurring basis are those assets for which the Company has recorded valuation adjustments and write-offs during the current period. The assets measured at fair value on a nonrecurring basis are as follows:

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Fair Value September 30, 2009 | Total Impairment Charge |
|---|---|---|---|---|---|
| Non-financial assets: | | | | | |
| Investment in real estate | $— | $620 | $3,242 | $3,862 | $884 |

In accordance with the Impairment or Disposal of Long-Lived Assets Subsections of ASC Topic 360, long-lived assets sold or held for sale with a carrying amount of $4.8 million were written down to their fair value of $3.9 million, *resulting in a loss of $0.9 million, which was included in impairment losses for the three months ended September 30, 2009*, compared to impairment charges of $1.3 million during

the three months ended September 30, 2008. ***Impairment charges on investment in real estate were $13.3 million and $3.8 million during the nine months ended September 30, 2009 and 2008, respectively***.  [Emphasis added.]

66.    In connection with the 3Q:09 Form 10-Q, defendants Greene and McCalmont also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), certifying that they had reviewed the Form 10-Q, and, inter alia:

- ***The "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*.**"

- ***The "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*.**"

- ***Defendants had "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***; (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."

- Have "disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."  [Emphasis added.]

67.     Also, pursuant to Section 906 of SOX, defendants Greene and McCalmont certified that: (i) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and that, (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

68.     The statements made or caused to be made, or allowed to be made by defendants and contained in the Company's November 3, 2009 release, and those statements contained in St. Joe's 3Q:09 Form 10-Q, were each materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly or negligently disregarded as such, for the reasons stated herein in ¶¶ 58, 61-62, *supra*.

69.     On January 26, 2010, defendants caused the Company to publish a release that announced an agreement between the Company and CB Richard Ellis Group, Inc., a commercial real estate service firm, purportedly to market sale or lease more than 1,000 acres of held by the Company, adjacent to the new Northwest Florida Beaches International Airport, scheduled to open May 23, 2010.  In addition to the foregoing, defendants used this release to condition investors to believe that the Company was continuing to successfully execute its real estate development plans, in part, as follows:

> CB Richard Ellis will be undertaking a major effort to solicit global office, retail and industrial users for this prime development location. The site is part of approximately 71,000 acres (28,700 hectares) that St. Joe owns within the West Bay Sector Plan, a large mixed-use master-planned project located in Bay County in Northwest Florida.
>
> "***The Northwest Florida region offers tremendous opportunities and potential to the global marketplace and we are very excited to participate in the development of this region***," said Robert McFarlane, Senior Vice President, CB Richard Ellis Global Corporate Services. "St. Joe's greenfield land in the West Bay Sector is strategically located to provide growth oriented companies with ample capacity and vast expansion opportunities for the future, as well as easy access to the new airport, a deepwater port and rail connections." [Emphasis added.]

70.     On February 23, 2010, defendants caused the Company to publish a release announcing purported results for the fourth quarter and year end 2009, ended December 31, 2009. This release stated, in part, the following:

> Jacksonville, Florida - (February 23, 2010) - The St. Joe Company (NYSE: JOE) today announced a Net Loss for the full year ended 2009 of $(130.0) million, or $(1.42) per share, compared to a Net Loss of $(35.9) million, or $(0.40) per share, for the year ended 2008. Included in the 2009 results were significant pre-tax charges of $163.1 million, or $1.07 per share after tax, compared to pre-tax charges of $109.5 million, or $0.69 per share after tax, in the year ended 2008….
>
> *   *   *
>
> St. Joe continues its pre-development activity on 1,000 acres (400 hectares) within the West Bay Sector Plan adjacent to the new airport. The master plan is complete and the infrastructure design is in final engineering. It has been designed to accommodate office, retail, industrial and hotel uses, and construction on the Phase 1 infrastructure is slated to begin in the second quarter of 2010.
>
> *   *   *
>
> **Fourth Quarter 2009 Financial Results**
>
> For the fourth quarter of 2009, St. Joe had a Net Loss of $(59.3) million, or $(0.65) per share, which included pre-tax charges of $84.0 million, or $0.56 per share after tax. This compares to a Net Loss of $(27.9) million, or $(0.31) per share, for the fourth quarter of 2008, which included pre-tax charges of $57.9 million, or $0.36 per share after tax.
>
> St. Joe's fourth quarter earnings included $73.3 million of pre-tax, non-cash impairment charges including $67.8 million related to the sale of the remaining assets at Victoria Park ($6.9 million recorded in discontinued operations), $3.5 million related to the sale of the St. Johns Golf & Country Club (recorded in discontinued operations), $1.1 million related to the sale of the assets acquired in connection with the settlement of our Saussy Burbank notes receivable, $0.8 million associated with various homes and homesites and $0.1 million associated with a builder note receivable. The Company also wrote-off $7.2 million of capitalized costs related to abandoned development plans in certain of our projects and incurred a restructuring charge of $3.5 million related to one-time termination benefits.

71.     Regarding the Company's liquidity and balance sheet performance, defendants caused St. Joe's February 23, 2010 release to state, in part, the following:

**Liquidity and Balance Sheet**

At December 31, 2009, St. Joe had cash of $163.8 million and pledged treasury securities of $27.1 million, along with debt of only $39.5 million, $27.1 million of which is defeased debt. The majority of the Company's tax receivable of $62.4 million is expected to be received in the second half of 2010. St. Joe's $125 million revolving credit facility remained undrawn at December 31, 2009.

                              *     *     *

Capital expenditures for the full year 2009 were $18.4 million, compared to $34.7 million for the same period in 2008, a reduction of 47 percent. In addition, St. Joe incurred cash overhead costs of $57.6 million for the full year 2009, compared to $81.7 million for the same period in 2008, a 30 percent reduction.

72.     In addition to the foregoing, the February 23, 2010 release, caused to be published by defendants, quoted defendants Greene and McCalmont, in part, as follow:

St. Joe's President and CEO Britt Greene stated, "2009 was marked by many St. Joe accomplishments during a very turbulent economic year for the country. *We significantly strengthened our balance sheet, reduced overhead costs and increased our financial flexibility*. We also focused our efforts on positioning the Company to benefit from the May 2010 opening of the new Northwest Florida Beaches International Airport. We are energized by the significant opportunities the airport will present since it is surrounded by some of St. Joe's most valuable land holdings."

                              *     *     *

"*In 2009, we successfully continued our efforts to reduce capital expenditures, eliminate expenses and increase our financial flexibility*," said William S. McCalmont, St. Joe's Executive Vice President and CFO. "Our liquidity position has been enhanced due to the utilization of our tax-loss carryback strategy, the sales of non-strategic assets, the disposition of aging home inventories and the successful renegotiation and extension of our corporate credit facility. *For 2010 and beyond, we are well positioned to maximize the opportunities that the opening of the new Northwest Florida Beaches International Airport will provide*." [Emphasis added.]

73.     As shares of St. Joe continued to trade at levels artificially inflated as a result of defendants' publication of false and materially misleading statements, on February 23, 2010, defendants caused to be filed with the SEC the Company's 2009 Form 10-K, for the fourth quarter and year ended December 31, 2009, signed by all defendants and certified by defendants Greene and McCalmont.  In addition to making substantially similar statements concerning the Company

operations, including asset values, expenses, costs and ratios, as had been published previously, the 2009 Form 10-K also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

**2.      Basis of Presentation and Significant Accounting Policies**

*Investment in Real Estate*

Costs associated with a specific real estate project are capitalized during the development period. The Company capitalizes costs directly associated with development and construction of identified real estate projects. Indirect costs that clearly relate to a specific project under development, such as internal costs of a regional project field office, are also capitalized. Interest is capitalized (up to total interest expense) based on the amount of underlying expenditures and real estate taxes on real estate projects under development. If the Company determines not to complete a project, any previously capitalized costs are expensed in the period such determination is made.

Real estate inventory costs include land and common development costs (such as roads, sewers and amenities), multi-family construction costs, capitalized property taxes, capitalized interest and certain indirect costs. Construction costs for single-family homes are determined based upon actual costs incurred. A portion of real estate inventory costs and estimates for costs to complete are allocated to each unit based on the relative sales value of each unit as compared to the estimated sales value of the total project. These estimates are reevaluated at least annually, and more frequently if warranted by market conditions or other factors, with any adjustments being allocated prospectively to the remaining units available for sale.

Investment in real estate is carried at cost, net of depreciation and timber depletion. Depreciation is computed on straight-line method over the useful lives of the assets ranging from 15 to 40 years. Depletion of timber is determined by the units of production method, whereby capitalized timber costs are accumulated and expensed as units are sold.

*      *      *

*Long-Lived Assets and Discontinued Operations*

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing

project and using management's best estimates about future sales prices and holding
periods.

The Company classifies the assets and liabilities of a long-lived asset as held-for-
sale when management approves and commits to a formal plan of sale and it is
probable that a sale will be completed. The carrying value of the assets held-for-
sale are then recorded at the lower of their carrying value or fair market value less
costs to sell. The operations and gains on sales reported in discontinued operations
include operating properties sold during the year and assets classified as held-for-
sale for which operations and cash flows can be clearly distinguished and for which
the Company will not have continuing involvement or significant cash flows after
disposition. The operations from these assets have been eliminated from ongoing
operations. Prior periods have been reclassified to reflect the operations of these
assets as discontinued operations. The operations and gains on sales of operating
assets for which the Company has continuing involvement or significant cash flows
are reported as income from continuing operations.

74.     The Company's 2009 Form 10-K was also caused to contain representations which

again attested to the purported effectiveness and sufficiency of the Company's controls and

procedures, as follows:

Item 8A.          Controls and Procedures

(a)     Evaluation of Disclosure Controls and Procedures.   Our Chief Executive
Officer and Chief Financial Officer have evaluated the effectiveness of the
Company's disclosure controls and procedures (as such term is defined in Rules 13a-
15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the
"Exchange Act")) as of the end of the period covered by this report. ***Based on this
evaluation, our Chief Executive Officer and Chief Financial Officer have
concluded that, as of the end of the period covered by this report, our disclosure
controls and procedures are effective in bringing to their attention on a timely
basis material information relating to the Company*** (including its consolidated
subsidiaries) required to be included in the Company's periodic filings under the
Exchange Act.

(b)     Changes in Internal Control Over Financial Reporting.   During the quarter
ended December 31, 2009 there were no changes in our internal controls over
financial reporting that have materially affected, or are reasonably likely to
materially affect, our internal controls over financial reporting.

(c)     Management's Annual Report on Internal Control Over Financial Reporting.

Management of the Company is responsible for establishing and maintaining
adequate internal control over financial reporting as defined in Rules 13a-15(f) and

40

15d-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(i)      pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii)     *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles*, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

(iii)    provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

*Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2009*. In making this assessment, management used the criteria described in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

Based on our assessment and those criteria, *management concluded that our internal control over financial reporting was effective as of December 31, 2009*. Management reviewed the results of their assessment with our Audit Committee. The effectiveness of *our internal control over financial reporting as of December 31, 2009 has been audited by KPMG LLP*, an independent registered public accounting firm, as stated in their report which is included below.

75.    Regarding its' purported Consolidated Balance Sheet, the Company's 2009 Form 10-K was also caused to state, in part, the following:

## CONSOLIDATED BALANCE SHEETS

| | December 31, 2009 | December 31, 2008 |
|---|---|---|
| | (Dollars in thousands) | |
| **ASSETS** | | |
| Investment in real estate | $  749,500 | $  890,583 |
| Cash and cash equivalents | 163,807 | 115,472 |
| Notes receivable | 11,503 | 50,068 |
| Pledged treasury securities | 27,105 | 28,910 |
| Prepaid pension asset | 42,274 | 41,963 |
| Property, plant and equipment, net | 15,269 | 19,786 |

| | | |
|---|---:|---:|
| Income taxes receivable | 62,392 | 32,308 |
| Other assets | 26,290 | 35,199 |
| Assets held for sale | — | 3,989 |
| | $ 1,098,140 | $ 1,218,278 |

76.     Regarding its' purported Investment in Real Estate, the Company's 2009 Form 10-K was also caused to state, in part, the following:

### Investment in Real Estate

Costs associated with a specific real estate project are capitalized during the development period. The Company capitalizes costs directly associated with development and construction of identified real estate projects. Indirect costs that clearly relate to a specific project under development, such as internal costs of a regional project field office, are also capitalized. Interest is capitalized (up to total interest expense) based on the amount of underlying expenditures and real estate taxes on real estate projects under development. If the Company determines not to complete a project, any previously capitalized costs are expensed in the period such determination is made.

Real estate inventory costs include land and common development costs (such as roads, sewers and amenities), multi-family construction costs, capitalized property taxes, capitalized interest and certain indirect costs. Construction costs for single-family homes are determined based upon actual costs incurred. A portion of real estate inventory costs and estimates for costs to complete are allocated to each unit based on the relative sales value of each unit as compared to the estimated sales value of the total project. These estimates are reevaluated at least annually, and more frequently if warranted by market conditions or other factors, with any adjustments being allocated prospectively to the remaining units available for sale.

Investment in real estate is carried at cost, net of depreciation and timber depletion. Depreciation is computed on straight-line method over the useful lives of the assets ranging from 15 to 40 years. Depletion of timber is determined by the units of production method, whereby capitalized timber costs are accumulated and expensed as units are sold.

77.     Regarding its' purported review of long-lived Assets and necessary asset write-downs during the quarter, the 2009 Form 10-K was caused to state, in part, the following:

The Company's assets measured at fair value on a nonrecurring basis are those assets for which the Company has recorded valuation adjustments and write-offs during the year. The assets measured at fair value on a nonrecurring basis were as follows:

| Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Fair Value December 31, 2009 | Total Impairment Charge |
|---|---|---|---|---|

| Non-recurring: | | | | | | | | | |
| Non-financial assets: | | | | | | | | | |
| Investment in real estate | $ | — | $ | 44,140 | $ | 13,577 | $ | 57,717 | $ | 93,565 |
| Other long term assets | | — | | — | | 587 | | 587 | | 1,119 |
| Total | $ | — | $ | 44,140 | $ | 14,164 | $ | 58,304 | $ | 94,684 |

In accordance with the Impairment or Disposal of Long-Lived Assets Subsections of ASC 360, long-lived assets sold or held for sale with a carrying amount of $151.3 million were written down to their fair value of $57.7 million, resulting in a loss of $93.6 million, which was included in impairment losses for 2009.

Given the downturn in its real estate markets, the Company implemented a tax strategy for 2009 to benefit from the sale of certain non-strategic assets at a loss. Under federal tax rules, losses from asset sales realized in 2009 can be carried back and applied to taxable income from 2007, resulting in a federal income tax refund for 2009. As part of this strategy, the Company conducted a nationally marketed sale process for the disposition of the remaining assets of its non-strategic Victoria Park community in Deland, Florida, including homes, homesites, undeveloped land, notes receivable and a golf course. Based on the likelihood of the closing of the sale, *management concluded on December 15, 2009 that an impairment charge for $67.8 million was necessary*. The Company completed the sale on December 17, 2009 for $11.0 million.

The Company completed the sale of its SevenShores condominium and marina development project for $7.0 million and the forgiveness of notes payable in the amount of $5.5 million earlier in 2009. The Company recorded an impairment charge of $6.7 million as a result of lower market pricing. *The Company also sold St. Johns Golf and Country Club for $3.0 million in December 2009 which resulted in an impairment charge of $3.5 million. In addition, the Company wrote-off $7.2 million of capitalized costs related to abandoned development plans in certain of its communities.*

*As a result of the Company's property impairment analyses for 2008, it recorded impairment charges related to investment in real estate of $40.3 million* consisting of $12.0 million related to completed homes in several communities and $28.3 million related to the Company's SevenShores condominium and marina development project. *In addition, the Company recorded an impairment charge of $19.0 million during 2008 related to the remaining goodwill associated with the 1997 acquisition of certain assets of the Arvida Company*.

The SevenShores condominium project was written down in the fourth quarter of 2008 to approximate the fair market value of land entitled for 278 condominium units. This write-down was necessary because in the fourth quarter of 2008 the Company elected not to exercise its option to acquire additional land under its option agreement. Certain costs had previously been incurred with the expectation that the project would include 686 units. [Emphasis added.]

78.     In connection with the 2009 Form 10-K, Defendants Greene and McCalmont also signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), certifying that they had reviewed the Form 10-K, and*, inter alia*:

(a)     **The "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading** with respect to the period covered by this report;"

(b)     **The "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition**, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;"

(c)     **Defendants had: (i) "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known** to us by others within those entities, particularly during the period in which this report is being prepared; (ii) **[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements** for external purposes in accordance with generally accepted accounting principles; (iii) **[e]valuated the effectiveness of the registrant's disclosure controls and procedures** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (iv) [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;" and

(d)      Have "disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): (i) *[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting* which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (ii) [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." [Emphasis added.]

79.      Also, pursuant to Section 906 of SOX, Defendants Greene and McCalmont certified that: (i) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and that, (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

80.      The statements made or caused to be made, or allowed to be made by defendants and contained in the Company's January 26, 2010 release and its February 23, 2010 release, and those statements contained in St. Joe's 1999 Form 10-K, were each materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly or negligently disregarded as such, for the reasons stated herein.

81.      On May 4, 2010, defendants caused the Company to publish a release announcing purported results for the first quarter of 2010, the period ended March 31, 2010.  This release was also caused to state, in part, the following:

> Jacksonville, Florida - (May 4, 2010) -The St. Joe Company (NYSE: JOE) today announced a Net Loss for the first quarter ended March 31, 2010 of $(11.4) million, or $(0.13) per share, compared to a Net Loss of $(12.0) million, or $(0.13) per share, for the first quarter of 2009.
>
> *      *      *
>
> **First Quarter Highlights**
>
> *      Announced the relocation of the Company's corporate headquarters to its

VentureCrossings Enterprise Centre at the new international airport.

   *      Sold 2.8 acres of commercial land for $0.3 million, or $110,000 per acre.

   *      Sold 72 acres of rural land for $0.4 million, or over $5,500 per acre.

   *      Generated $0.6 million of revenue from the sale of 9 mitigation bank credits.

   *      Generated $0.5 million of revenue from the sale of 6 residential homesites.

   82.      Regarding the Company's liquidity and balance sheet performance, the May 4, 2010

release was caused to state, in part, the following:

**Liquidity and Balance Sheet**

At March 31, 2010, St. Joe had cash of $152.6 million, pledged treasury securities of $26.7 million and debt of $39.2 million, $26.7 million of which is defeased debt. The majority of the Company's tax receivable of $64.9 million is expected to be received in the second half of 2010. St. Joe's $125 million revolving credit facility remained undrawn at March 31, 2010.

                              *    *    *

Capital expenditures for the first quarter of 2010 were $1.6 million, compared to $5.5 million for the same period in 2009, a reduction of 71 percent. In addition, St. Joe incurred cash overhead costs of $12.4 million during the quarter, compared to $17.3 million for the first quarter last year, a 28 percent reduction.

   83.      In addition to the foregoing, defendants Greene and McCalmont used the Company's

May 4, 2010 release to condition investors to believe that St. Joe was continuing to enjoy a "positive

regional transformation" that was sustaining or elevating the Company's real estate investments.  As

evidence of this, the release was also caused to state, in relevant part, the following:

"**_A positive regional transformation is beginning_** as we get closer to the opening of the country's newest international airport," said St. Joe's President and CEO Britt Greene. "The new airport with service provided by Southwest Airlines and Delta Air Lines significantly improves the accessibility to Northwest Florida, its workforce and its beaches. Our nearly debt free balance sheet, efficient cost structure and more than 300,000 acres of land within 40 miles of the new airport position us to take full advantage of the many opportunities that will arise for decades to come."

                              *    *    *

"With virtually no debt, streamlined operations and our announced relocation that

46

will consolidate our corporate offices at the heart of our vast land holdings, *we are well positioned to pursue the opportunities that will contribute to building shareholder value for many years in the future,*" said William S. McCalmont, St. Joe's Executive Vice President and CFO.  [Emphasis added.]

84.     As shares of St. Joe continued to trade at levels artificially inflated as a result of the publication of defendants' false and materially misleading statements, on May 4, 2010, defendants also caused to be filed with the SEC, the Company's 1Q:10 Form 10-Q, for the quarter ended March 31, 2010, signed by defendant Greene, and certified by defendants Greene and McCalmont. In addition to making substantially similar statements concerning the Company's asset values, operations, including expenses, costs and ratios, as had been published previously, the 1Q:10 Form 10-Q was again caused to report the Company's Significant Accounting Policies, and the Basis of its Accounting Presentation, in part, as follows:

**Basis of Presentation**

*The accompanying unaudited interim financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission for reporting on Form 10-Q.* Accordingly, certain information and footnotes required by U.S. generally accepted accounting principles for complete financial statements are not included herein. The consolidated interim financial statements include the accounts of the Company and all of its majority-owned and controlled subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The December 31, 2009 balance sheet amounts have been derived from the Company's December 31, 2009 audited financial statements.

*The statements reflect all normal recurring adjustments that, in the opinion of management, are necessary for fair presentation of the information contained herein.* The consolidated interim statements should be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2009. The Company adheres to the same accounting policies in preparation of its interim financial statements. As permitted under generally accepted accounting principles, interim accounting for certain expenses, including income taxes, are based on full year assumptions. For interim financial reporting purposes, income taxes are recorded based upon estimated annual income tax rates.

85.     Also, pursuant to Section 906 of SOX, Defendants Greene and McCalmont certified that: (i) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and that, (ii) the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

86.     The statements made or caused to be made, or allowed to be made by defendants and contained in the Company's May 4, 2010 release, and those statements contained in St. Joe's 1Q:10 Form 10-Q, were each materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly or negligently disregarded as such, for the reasons stated herein in ¶¶ 81, 84, *supra*.

87.     On May 24, 2010, defendants again caused the Company to issue a release, announcing the opening of the Northwest Florida Beaches International Airport.  In addition to the foregoing, however, defendants used this release to condition St. Joe shareholders to believe that the Company was continuing to successfully execute its real estate development plans.  This release was caused to state, in part, the following:

> The St. Joe Company (NYSE: JOE) today announced that the Northwest Florida Beaches International Airport opened on Sunday, May 23rd with service from Southwest Airlines and Delta Air Lines. The new airport is the first international commercial service airport built in the United States in the last 15 years. St. Joe donated 4,000 acres within its 75,000-acre West Bay Sector Plan for the airport's construction.
>
> *   *   *
>
> Located adjacent to the new airport, St. Joe's VentureCrossings Enterprise Centre is one of the nation's most unique office, retail, hotel and industrial developments. VentureCrossings includes approximately 100 acres designated for retail, office and hotel uses, approximately 300 acres for light industrial uses, and approximately 600 acres for manufacturing, distribution and logistics companies seeking "through the fence" access to the new airport's 10,000 foot runway.
>
> *   *   *
>
> Within VentureCrossings, St. Joe is developing an approximately 60,000 square foot

Class A multi-tenant office building with construction beginning later this summer. The company will relocate its corporate headquarters, currently in Jacksonville, Florida, to this multi-tenant building by the summer of 2011. Also within VentureCrossings, St. Joe is developing an approximately 30,000 square foot light industrial building with construction also beginning later this year.

88.     On August 4, 2010, defendants caused the Company to issue a release announcing purported results for the second quarter of 2010, the period ended June 30, 2010. This release was caused to state, in part, the following:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter ended June 30, 2010 of $(8.6) million, or $(0.09) per share, including a pre-tax restructuring charge of $1.2 million or $0.01 per share after tax. This compares to a Net Loss in the second quarter of 2009 of $(44.8) million, or $(0.49) per share, which included pre-tax non-cash charges of $64.7 million or $0.43 per share after tax.
>
> Net Loss for the first half of 2010 was $(20.0) million, or $(0.22) per share. This compares to a Net Loss during the same period of 2009 of $(56.9) million, or $(0.62) per share, which included pre-tax non-cash charges of $66.2 million or $0.44 per share after tax.
>
> *     *     *
>
> **Balance Sheet**
>
> At June 30, 2010, St. Joe had cash of $138.9 million, pledged treasury securities of $26.2 million and debt of $38.9 million, $26.2 million of which is defeased debt. The Company's $125 million revolving credit facility remained undrawn at June 30, 2010. Subsequent to the end of the quarter, St. Joe received a $67.7 million tax refund from the United States Department of the Treasury.
>
> *     *     *
>
> Capital expenditures for the first six months of 2010 were $6.0 million, compared to $9.4 million for the same period in 2009, a reduction of 36 percent. In addition, St. Joe incurred cash overhead costs of $11.9 million during the quarter, compared to $14.4 million for the second quarter last year, a 17 percent reduction.

89.     In addition to the foregoing, the August 4, 2010 release also quoted defendants Greene and McCalmont, who purported to report the financial strength and well being of the Company. This release was caused to state, in part, the following:

> "The successful opening of the new airport has made the region more easily

49

accessible to the rest of the country and the global marketplace," said Greene. "Although we remain concerned about the impact of the oil spill, we continue to believe the airport has the potential to greatly accelerate the positive transformation that is occurring in Northwest Florida and contribute to the economic prosperity the region will realize over the coming decades."

*    *    *

"*With our nearly debt-free balance sheet, efficient cost structure and more than 300,000 acres of land within 40 miles of the new airport, we have positioned the Company to take advantage of the increased economic activity that we expect to realize as a result of the opening of the new airport*," said William S. McCalmont, St. Joe's Executive Vice President and CFO.  [Emphasis added.]

90.     Despite the fact that defendants did not make any significant write-downs or record any material asset impairments to its Florida real estate portfolio, on August 4, 2010 defendants also caused the Company to announce that defendants had caused the Company to file a lawsuit seeking the recovery of damages in connection with the Deepwater Horizon/PB Oil Spill incident. The assessment process and any resulting litigation are expected to continue for an extended period of time.  According to defendant Greene, at that time, the Company had sustained material damage as a result of this disaster and that, "[p]rior to the oil spill, we had seen momentum building in our operations; however, the oil spill has adversely impacted our markets and has created uncertainty about the future of the Gulf Coast region."

91.     As shares of St. Joe continued to trade at levels artificially inflated as a result of the publication of defendants' false and materially misleading statements, on August 5, 2010, defendants also caused to be filed with the SEC, the Company's 2Q:10 Form 10-Q, for the quarter ended June 30, 2010, signed by defendants Greene and Connolly, and certified by defendants Greene and McCalmont. In addition to making substantially similar statements concerning the Company's asset values, operations, including expenses, costs and ratios, as had been published previously, the 2Q:10

Form 10-Q was again caused to report the Company's Significant Accounting Policies, and the Basis

of its Accounting Presentation, in part, as follows:

### Basis of Presentation

***The accompanying unaudited interim financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission for reporting on Form 10-Q.*** Accordingly, certain information and footnotes required by U.S. generally accepted accounting principles for complete financial statements are not included herein. The consolidated interim financial statements include the accounts of the Company and all of its majority-owned and controlled subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. The December 31, 2009 balance sheet amounts have been derived from the Company's December 31, 2009 audited financial statements.

***The statements reflect all normal recurring adjustments that, in the opinion of management, are necessary for fair presentation of the information contained herein.*** The consolidated interim statements should be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2009. The Company adheres to the same accounting policies in preparation of its interim financial statements. As permitted under generally accepted accounting principles, interim accounting for certain expenses, including income taxes, are based on full year assumptions. For interim financial reporting purposes, income taxes are recorded based upon estimated annual income tax rates**.** [Emphasis added.]

92.     Also, pursuant to Section 906 of SOX, Defendants Greene and McCalmont certified

that: (i) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities

Exchange Act of 1934; and that, (ii) the information contained in the Report fairly presents, in all

material respects, the financial condition and result of operations of the Company.

93.     The statements made or caused to be made, or allowed to be made by defendants and

contained in the Company's August 4, 2010 release, and those statements contained in St. Joe's

2Q:10 Form 10-Q, were each materially false and misleading and were known by defendants to be

materially false and misleading at that time, or were recklessly or negligently disregarded as such thereby, for the reasons stated herein in ¶¶ 88, 91, *supra*. [2]

## DEFENDANTS' MISCONDUCT BEGINS TO BE REVEALED

94.     On October 13, 2010, Greenlight Capital's David Einhorn, appeared at the Value Investing Congress, where he presented a 139-slide presentation that combined a balance sheet analysis with photos and videos Einhorn's team took of St. Joe's properties. They showed empty lots, abandoned houses and vacant retail storefronts. Einhorn's basic conclusion was that the Company's holdings of Florida real estate are worth nowhere near the $746 million the defendants caused the Company to report, and that defendants had caused St. Joe to fail to take tens, or potentially hundreds, of millions of dollars in impaired asset write-downs.

95.     Within minutes of Einhorn concluding his presentation, St. Joe shares declined precipitously, immediately falling over 10% in regular trading, on very high trading volume.  The following day, as investors learned the details of the Einhorn presentation, shares of the Company declined another 10%, for a two-day decline of over 20%.

96.     Following the Einhorn presentation on October 13, 2011, and following the sudden collapse in the price of St. Joe stock *The Wall Street Journal* reported, in part, the following:

**Einhorn on St. Joe Development: 'A Ghost Town'**

Greenlight Capital's David Einhorn took stock pickers through a tour of Florida's

---

[2] Defendants also caused the Company to publish press releases and file with the SEC quarterly and year end reports on November 2, 2010, March 2 and 3, 2011 and May 5, 2011 that reiterated many of the same materially false and misleading statements as were reported herein, *supra*. The statements made or caused to be made, or allowed to be made by defendants and contained in the Company's releases and in its quarterly Form(s) 10-Q and in its year end 2010 report on Form 10-K, were also each materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly or negligently disregarded as such thereby, for the reasons stated herein in ¶ 2, *supra*.

panhandle as he outlined the reasons he's shorting the stock of real estate developer St. Joe Company.

***The basic thesis: the company's holdings of Florida real estate are worth nowhere near the $746 million the company says they are worth***. Rather than the $20 to $28 range St. Joe shares have been trading at, Einhorn thinks that at best the company is worth $7 to $10 per share. And if the company's management doesn't change course, he argues it could eventually fall to zero.

\*   \*   \*

His talk to the Value Investing Congress Wednesday — which was received with rousing applause — was accompanied ***by a 139-slide presentation that combined not just the usual balance sheets and quotes from annual reports, but photos and videos Einhorn's team took of St. Joe's properties. They showed empty lots, abandoned houses and vacant retail storefronts.***

Einhorn's talk focused on St. Joe's main development properties, but began drilling into the company's recent assertions that it will get a big boost from development around the Northwest Florida Beaches International Airport, an airport surrounded by timberland north of Panama City Beach, Fla. St. Joe had given land to help build the airport, Einhorn said.

\*   \*   \*

But Einhorn said that of the seven gates at the airport, only one can accommodate the 737 planes flown by Southwest. In addition, he questioned the attractiveness of property owned by St. Joe immediately around the airport and said that St. Joe is now trying to re-lease land it had given to help get the airport built.

***The center of his argument that St. Joe has been overvalued is its residential developments***. One big issue, Einhorn said, is that ***St. Joe has already sold many of its best properties*** – especially those that are beach-front real estate. Many of the properties the firm is carrying on its books are in some cases miles from the beach. Worse, Einhorn said, ***many of the properties that St. Joe sold are undeveloped lots that are in the hands of land speculators or owned by banks through foreclosure. Thus St. Joe is having to compete against those owners who are selling properties at sharply lower prices than on St. Joe's books***.

For this, Einhorn's team visited St. Joe's developments, scoured the property records in Florida and publicly information ***on the relatively few sales that have been made in recent years.*** One community is Rivertown, where Einhorn presented a video shot from a car driving down empty streets. At another, Watersound, they visited a golf course, which he said was "deserted." For Summercamp Beach he showed displayed a picture of an unfinished house.

He described the St. Joe community of ***Windmark*** *as his* ***"favorite" example. "This*** ***is a ghost town***," he said. Not only was the St. Joe property empty, "it seems like everything surrounding Windmark is for sale."

***One his final slides compared the values assigned to properties in three*** ***communities by St. Joe - $280.8 million - against Greenlight's assessment - $38.7*** ***million***. "I think that St. Joe and it's accountants might want to update their calculations," he said. ***"They need to take a substantial impairment" against the*** ***value of their real estate***, he said. Einhorn closed by noting that St. Joe has filed suit for damages caused by the BP oil spill this summer. But St. Joe's website notes that press releases from downplayed the impact of the oil spill. Pictures on the company's website show swimmers frolicking in the surf.

Asked where he could go wrong with his call against St. Joe, Einhorn replied "they could discover real oil."  [Emphasis added.]

97.    On October 13, 2010, *Forbes* also reported on the Einhorn presentation regarding St.

Joe, stating, in part, the following:

***Einhorn's case against St. Joe boils down to accounting. He says the company*** ***should take drastic write-downs on its vacant property developments in Florida***. In a notable moment, Einhorn played a video of driving through one of St. Joe's developments near Jacksonville. ***The company's plan was to develop 2,600 homes*** ***by 2011, Einhorn said. But it said earlier this year that only about 215 had been*** ***developed.***

***"It can't build, it can't sell, and it can't generate value to cover the operating*** ***costs***," Einhorn said. Shares fell this summer as investors worried that the BP oil spill would ruin some of St. Joe's beachfront properties. As Einhorn sees it, "Joe went from way way overvalued, to way overvalued." [Emphasis added.]

98.    David Einhorn's Greenlight Capital presentation at the Value Investing Congress was

accompanied by a 139-slide presentation that combined a balance sheet analysis as well as empirical

evidence collected on-site by Einhorn's investigators.   Later the same day on October 13, 2010,

these slides and a replay of this presentation were made available on the Internet.  The evidence

presented at the Value Investing Conference included, in part, the following:

(a)  That, St. Joe's Condensed Balance Sheet reported in the Company's 2009 Form 10-K was materially false and misleading because it reported total assets of $1.0981 billion dollars of assets, including $749.5 million in real estate;

(b)  That, by the 2Q:09, over a year into the national housing crisis, Florida home prices had fared far worse than the national average, and that while the national Home Price Index had fallen to just over 10% for all of the United States, the quarterly change in the Home Price Index fro Florida had exceeded 25% and was accelerating at a rate much faster than the rest of the U.S.;

(c)  That, as a result of Florida home sales being "hit very hard," St. Joe's business had "essentially stopped." This was evidenced by the following, as reported by the end of 2Q:10 : (i) by the middle of 2009, the number of St. Joe's reported Homes Sold had declined by approximately 50% from the middle of 2007, and this number had decelerated to nearly 0 by 2Q 2010; (ii) by the middle of 2009, the number of St. Joe's reported Homesites Sold had declined by approximately 75% from the middle of 2007, and this number had decelerated to nearly 0 by 2Q 2010; (iii) by the middle of 2009, the number of St. Joe's reported Commercial Acres Sold had declined by over 75% from the middle of 2007, and this number had decelerated to nearly 0 by 2Q 2010; and (iv) by the middle of 2009, the number of St. Joe's reported Rural Acres Sold had declined by over 80% from the middle of 2007, and this number had decelerated to nearly $0.00 by 2Q 2010;

(d)  That, as further evidence that St. Joe's business had "essentially stopped" by the beginning of the relevant period, by the time Joe filed its 2009 Form 10-K, Cash Expenditures for Operating Properties had fallen from approximately $600 million in 2006, to $200 million in 2007 to only several million dollars by the end of 2009;

(e)  That, despite making huge investments ahead of the national real estate and mortgage crisis, St. Joe was caused to take only modest write-downs to its real estate assets.  In fact,

in 2009, defendants had caused the Company to take only $14.5 million in assets for homes and homesites and abandoned development plans, while reporting total investment in real estate (as of Dec. 31) of $749.5 million.  This compared to total write-downs of $12.0 million in 2008, on total real estate assets of $890.6 million and $13.0 million on total real estate assets of $944.5 million in 2007;

      (f)      That, by January 31, 2010, development was well behind schedule at the Company's RiverTown development, with only 12 units completed between 2008 and the end of 2009.  Moreover, according to the Company's 2008 CDD Bond Offering Prospectus, St. Joe's estimated average cost of developing a lot in RiverTown, at $81,111, exceeded the average price per lot, of $72,133, for the 6 lots that the Company was able to sell in October 2007, and far exceeded the $31,250 average price for the 2 lots that St. Joe had sold in August 2010 (to the same purchaser) according to St. John's County Tax Appraisal Office records, reported by Greenlight - - representing a 57% decline in lot value from 10/07 to 8/10;

      (g)      That, in St. John's County, the location of the RiverTown development, according to Metrostudy Jacksonville Residential Survey, 1Q 2010, there existed nearly 9 years of developed lot inventory then available for sale, spread out across 144 existing sub-divisions;

      (h)      That, RiverTown was then less than 5% developed, that further development was not economic, that the remaining 185 developed lots which had a then current market value of $31,250, had an aggregate value of $6 million, that 9 years of unsold supply acted only to further reduce the possibility of a demand-driven price increase in the near-term and that, St. Joe was then currently carrying its unsold RiverTown properties on the Company's balance sheet at a recorded value of $74.491 million, or approximately $400,000 per developed lot;

(i)      That, in its marketing materials the Company was caused to consistently featured its one successful property, called WaterColor, in order to hide the fact that its other developments were not succeeding according to plan.  In fact, however, by that time WaterColor was already 90% developed and 80% sold, such that this property was not material to the Company's Profits and Loss statement going forward;

(j)      That, the WaterColor development, which had already sold all of its beachfront property and the vast majority of its desirable lots, was further evidence that the Company had already sold its best and most marketable properties such that little or no demand existed for the majority of its remaining inventory.  Similarly, at the Company's WaterSound development only interior lots, mainly across a highway, remained unsold with no beachfront property remaining and little demand for interior lots;

(k)      That, the Company's Franklin County, Cutter Ridge development, which was recorded on St. Joe's 2007 Form 10-K as a project "In Development" – or a project upon which construction had already commenced – was reclassified as in "Pre-Development" in the Company's 2009 Form 10-K;

(l)      That, the price at which the Company was selling beachfront lots at its SummerCamp development had fallen from an average price of $880,000 per lot for 5 lots sold in November 2006, to $331,000 per lot for 4 lots sold in July 2010, according to Franklin County Property Appraiser's records;

(m)      That, interior non-beachfront lots at SummerCamp that were sold by St. Joe for between $150,000 and $165,000 in 2005 and 2006, were being offered by the Company as low as $39,000 in August 2010;

(n)     That, based on the then current sales and price offerings of the 23 remaining beachfront lots (valued at $330,000), and the remaining 121 interior lots (valued at $60,000), the total value of the SummerCamp development was worth approximately $14.85 million.  This compared to the $41.768 million at which the Company was caused to record the value of these assets in St. Joe's 2009 Form 10-K;

(o)     That, the Company's WindMark development was also well behind development schedule and its properties were also being caused to be carried on St. Joe's balance sheet at values well in excess of then current market values for these assets;

(p)     That, beachfront lots at WindMark sold for $350,000 in October 2009 and interior lots sold for $104,000 in September 2010, resulting in a total implied value of $17.825 million for the 17 beachfront and 55 non beachfront lots and condominium units available, compared to the $164.511 million at which defendants caused the Company to record these assets in St. Joe's 2009 Form 10-K;

(q)     That, based on the $165 million of capitalized costs on the Company's balance sheet for the WindMark development, this would imply a $736,000 cost per lot for the 244 lots actually developed or, even if all remaining 1,367 lots were developed, this would imply a value of over $120,000 per each remaining lot, before deducing the future costs necessary to actually develop them;

(r)     That, WindMark's commercial space was then less than 50% developed and 95% vacant.  This implied that its $42.3 million in capitalized costs were also over valued;

(s)     That, on December 15, 2009, only 2 days prior to the sale of its Victoria Park assets for $11 million, defendants wrote down the value of these assets from their carrying value of $78.8 million.  The sale price of the Victoria Park assets implies a price of $100,000 each for 28

homes, $20,000 each for 350 lots and $2,000 each acre for 468 undeveloped acres.  This Compared to an average selling price of $240,000 for homes sold between 2003 and 2005 and $99,000 each for lots sold during this period;[3]

        (t)     That, by the end of 2009, the Company was caused to report $173 million in residential real estate amenities, including golf courses, beach clubs, parks and common areas, when these amenities generated $30 million in revenues per year while losing $3 million.  These amenities too should have been evaluated for impairment; and

        (u)     That, by the end of 2009, the Company had a carrying value of $59 million related to its commercial real estate, despite producing minimal revenues and very high vacancies.  Accordingly, commercial real estate values should also have been evaluated for impairment.

        99.    Immediately following the Einhorn presentation the financial press noted the adversarial positions of Greenlight Capital and defendant Berkowitz.   Accordingly, the following day, October 14, 2010, *TheStreet.com* reported, in part, the following:

> Berkowitz, Einhorn at Odds on St. Joe
>
> NEW YORK (TheStreet) -- Deep-value investor Bruce Berkowitz, who runs Fairholme Capital Management, has a significant chunk of Florida-based real estate company St. Joe (JOE), setting his position at odds with famous hedge fund titan David Einhorn.
>
> In a 13D filing with the Securities and Exchange Commission, the fund disclosed that it had acquired approximately 92,000 shares of St. Joe, taking the fund's total holding to a massive 29% stake in the company.

---

[3] By the end of 2009, nearly 45% of all planned residential units at Victoria Park had been sold, this compares to less than 1% at RiverTown, 16% at SummerCamp and 10% at WindMark.

100.    In addition to the foregoing, defendant Berkowitz also went on the offensive to defend St. Joe and to attempt to discredit or repudiate the Einhorn Report. Thus, the following day, October 15, 2010, *TheStreet.com* reported comments by Berkowitz, in part, as follows:

> MIAMI (TheStreet) -- Bruce Berkowitz, founder of Fairholme Capital Management, has a message for those who are shorting his long-term investments: Thanks for putting it on sale.
>
> In fact, in the case of The St. Joe Company (JOE), which is being vocally shorted by hedge-fund manager David Einhorn, Berkowitz in interested in buying the entire company.
>
> "We're long-term investors and we'd love to buy the entire company," Berkowitz told TheStreet in an interview Friday evening. "So, I really would like to create a situation where just everyone stays quiet and he can short to his heart's content. And we can ... buy to our heart's content, with the permission of the management."
>
> In response to Einhorn's take-down of St. Joe at a conference on Wednesday, Berkowitz says: "If David wants to create an asset at a cheaper price for me to buy, thank you."
>
> *      *      *
>
> Berkowitz says Fairholme has a standstill agreement with St. Joe, and isn't allowed to acquire any more shares without management's permission. However, he'd like to open discussions with the firm -- which is now valued just shy of $2 billion -- and "other parties" for a potential buyout.

101.    In his discussion with *TheStreet.com* regarding the issues raised by Einhorn, defendant Berkowitz stated, in part, the following:

> What's new in the presentation -- at least that I've not heard before -- is an insinuation that the accounting is bad. Now that's serious. Now you're saying that the management has gotten it wrong, the auditors have gotten it wrong, regulators have missed it. That's serious. That has to be addressed.
>
> David Einhorn is not a client of mine, so I do not feel the need to educate him….

102.    Similarly, defendant Berkowitz was also quoted in *The Wall Street Journal* on October 19, 2010, as stating, "Mr. Einhorn basically said the books were cooked and that's a serious

allegation…. There are auditors, a CFO and that stuff gets looked at on a quarterly basis," and for Einhorn to be correct, that would mean "the auditors are sleeping."

103.    Despite Berkowitz and the Individual Defendants' statements that the Company's assets were fairly valued, only days before the Einhorn presentation, St. Joe was caused to file suit against Transocean Offshore Deepwater Drilling, Inc. and its subsidiaries (collectively, "Transocean"), as a result of their role in the Deepwater Horizon Oil Spill.  Transocean was the owner of the Deepwater Horizon rig, which was being leased to BP Exploration & Production, Inc. when the Macondo well blew out on April 20, 2010, resulting in the largest oil spill in U.S. history. The lawsuit claims Transocean was responsible for the operation and maintenance of the Deepwater Horizon rig and its equipment, accountable for overseeing day-to-day drilling activities on the rig, and, therefore, responsible for performing or authorizing performance of many of the activities necessary to maintain well control at the drilling site. As a result of the incident, an estimated 205 million gallons of oil spilled into the Gulf of Mexico - causing tens of billions of dollars in total damages, and tens or hundreds of millions of dollars in damage to the Company.   This action was similar to two other actions that the Company was caused to file related to the Depwater Horizon incident, against Halliburton and MI-SWACO.  St. Joe, which owns approximately 577,000 acres in Florida, 70 percent of which are within 15 miles of the coast of the Gulf of Mexico, was caused to alledge that it had suffered a substantial decline in its enterprise value - faced with direct costs, an interruption to its business, and the diminution in the value of its assets.

104.    On December 16, 2010, defendants caused the Company to announce that defendants Berkowitz and Fernandez had been elected to the Company's Board of Directors, effective as of January 1, 2011.  According to the Company, at that time, the Board would then be comprised of

nine members, eight of whom defendants caused St. Joe to report were "independent." At that time,

defendants also caused the Company to publish a release that stated, in part, the following:

> "We are delighted to add Bruce and Charles to St. Joe's Board of Directors," said Hugh M. Durden, Chairman of the Board of Directors. "Bruce and Charles, both of whom bring strong experience and valuable strategic insight to our team, have a deep understanding of our business and its inherent long-term potential. These attributes, coupled with their capital markets expertise, will be immensely valuable to St. Joe going forward. We look forward to their meaningful contributions to the Company."

> Mr. Berkowitz said, "St. Joe has uniquely valuable assets and some of the most attractive, concentrated and well-managed real estate in the U.S. The value is in its development expertise, communities, infrastructure, entitlements, master plans, timberlands and most importantly the Company's long-term vision. *I am confident that St. Joe is well-positioned to succeed and look forward to working with management and the Board to deliver long-term value to all shareholders."*

> *Mr. Fernandez said, "With its enviable balance sheet and restructured operations, St. Joe is well-positioned to maximize the value of its properties and assets. I look forward to joining the Board and contributing to the effort."* [Emphasis added.]

105.    On January 10, 2011, *Bloomberg* reported that the Company was caused to announce

that the SEC had initiated in "inquiry" into St. Joe, related to its "Accounting for Land

Impairments." The *Bloomberg* report stated, in part, the following:

> St. Joe Co., the largest private landholder in northern Florida, said it faces an *informal inquiry by the U.S. Securities and Exchange Commission over its policies for impairing investment in real estate assets*.

> *      *      *

> The filing comes three months after David Einhorn, who runs hedge-fund operator Greenlight Capital Inc., said St. Joe failed to properly write down the value of its land after having sold its most valuable waterfront properties. Einhorn was shorting the stock, meaning he bet the share price would decline.

> "St. Joe's valuation practices remain open to question," Jonathan Doorley, a spokesman for Greenlight Capital, said today. *"It is hard to understand how the company invested hundreds of millions of dollars during the real estate bubble and hasn't seen fit to take a material writedown."*

> *      *      *

**Falling Land Values**

***Land values have plummeted in Florida***, which has the highest number of home foreclosures after California, according to RealtyTrac Inc., an Irvine, California-based real estate information company. [Emphasis added.]

106.    As soon as defendants Berkowitz and Fernandez joined the St. Joe Board, it appears that their first order of business was to cause the Company to revoke a 2009 "stand still" agreement that prevented Fairholme Funds or its subsidiaries from acquiring more than 30% of the Company's outstanding shares.  As evidence of this, on January 12, 2011, defendants caused St. Joe to file a Form 8-K with the SEC that reported, in part, the following:

> As previously reported, The St. Joe Company (the "Company") has a credit agreement with Branch Banking and Trust Company and Deutsche Bank for a $125 million revolving credit facility (the "Credit Agreement"). On January 12, 2011, as a result of its decision to terminate the Standstill Agreement (as discussed under Item 1.02 below), the Company entered into a Sixth Amendment to the Credit Agreement (the "Sixth Amendment") for the purpose of deleting references to the Standstill Agreement in the definition of Change in Control and deleting the covenant that requires the Company to keep the Standstill Agreement in full force and effect.

> The Sixth Amendment retains the provision that prohibits Fairholme Funds, Inc., Fairholme Capital Management, L.L.C., and each of their respective Affiliates (as defined in the Credit Agreement) and officers and directors from collectively acquiring beneficial ownership of more than 30% in the aggregate of the outstanding shares of the Company's voting stock, but clarifies that the provision does not apply to non-voting shares acquired in excess of 30%.

> Item 1.02 Termination of a Material Definitive Agreement.

> As previously reported, on April 6, 2009, the Company entered into an agreement (the "Standstill Agreement") with Fairholme Funds, Inc. and Fairholme Capital Management, L.L.C. (collectively, "Fairholme") permitting Fairholme, the Company's largest shareholder, to acquire beneficial ownership of up to 30% of the Company's outstanding common stock. As a result of the approval by the Company's Board of Directors (the "Board") of the Standstill Agreement, the control share acquisition provisions of the Florida Business Corporation Act, as amended (the "FBCA"), which generally provide that shares acquired in excess of 20% will not possess any voting rights, did not apply.

> During the term of the Standstill Agreement, Fairholme and its Affiliates (as defined in the Standstill Agreement) agreed not to (i) acquire, offer to acquire, seek, propose

or agree to acquire any material portion of the assets or properties of any material business of the Company or its subsidiaries or 30% or more of the Company's outstanding common stock, (ii) seek or propose to influence or advise (other than contacts with the officers or Board), change or control management or the Board or affairs of the Company or influence the vote of other persons, (iii) call special meetings or participate in any proxy solicitation or action by written consent, (iv) make any disclosure or take any action that would require the Company to make any public disclosure with respect to the matters covered in the Standstill Agreement, other than communications with Fairholme's stockholders or account holders in the ordinary course of business and required disclosure of the existence of the Standstill Agreement, or (v) contact others or form a group with any other person with respect to any of the foregoing activities.

107.    Having caused the Company to remove the impediments to Fairholm acquiring more of St. Joe's shares, next defendants Berkowitz and Fernandez attempted to consolidate their control over the Board by seeking the nomination of former Florida Governor, Charlie Crist, to the St. Joe Board.   As evidence of this, on February 10, 2011, *Bloomberg* reported, in part, the following:

> Bruce Berkowitz of Fairholme Capital Management LLC, St. Joe Co.'s largest shareholder, is seeking to put former Florida Governor Charlie Crist on the real estate developer's board.
>
> Crist was named as an alternative candidate to Rodney Barreto, chairman of Florida's Fish and Wildlife Conservation Commission, according to a regulatory filing today. ***Barreto may not be considered an independent director because he has provided services to St. Joe., Berkowitz said.***[4]
>
> Crist "is well-known to all of you," Berkowitz said in an e-mail to the board that was included in the filing. The former governor, 54, led Florida from 2007 until January. [Emphasis added.]

108.    At that time, it was not disclosed that both Fernandez and Berkowitz had previously backed Crist in public office, and had previously donated to his political campaigns.   Nor was it

---

[4] Surprisingly, the same logic was not used to find that defendant Fanning was not independent, even after subsidiaries of The Southern Company, which he controls, sold land options and wetland mitigation credits to St. Joe.

disclosed that defendant Murphy had also donated to Crist, through the company he owned and controlled, Coastal Construction Group.

109.    On February 14, 2011, however, defendant Berkowitz and Fernandez announced that they were resigning from the Board of the Company.  That day, *Reuters* reported, in part, the following:

**Fairholme leaders resign from St. Joe board**

*       ***Berkowitz and Fernandez resign from board***

*       Fund manager says he does not plan to sell shares

*       Shares fall 2.4 percent

NEW YORK, Feb 14 (Reuters) - The largest shareholder of St. Joe Co. (JOE.N) on Monday quit the board just six weeks after joining it, raising speculation that he could fight for control of one of Florida's largest private land owners.

Mutual fund manager Bruce Berkowitz's abrupt resignation, along with colleague Charles Fernandez, is the latest twist for St. Joe, which has big stakes in the return of the hard-hit Florida real estate market.

*     *     *

***Berkowitz, who runs Fairholme Capital Management LLC, and Fernandez sent a terse email to the board on Monday saying the board was not committed to shareholder value or pay for performance for management.***

Berkowitz said he does not plan to sell his shares. His fund firm owns nearly 30 percent of St. Joe's stock.

"We're not walking away, and whatever actions we take we're going to take for all shareholders," Berkowitz told Reuters in a telephone interview.

***"We were trying to get this done in the nicest possible way, at the director level. But we stated that if we couldn't, we'll try to get it done at the shareholder level. That's the reason why we resigned and that's, just say, step one."***

Berkowitz had no comment when asked if he would now launch a proxy fight to gain control of the board, but industry observers say he may be headed in that direction.

*     *     *

Berkowitz and Fairholme President Charles Fernandez joined the board in January and raised their stake in the company after Einhorn's October comments drove down the shares. Berkowitz has repeatedly said he would buy the whole company if he could.

St. Joe's ownership is highly concentrated. Other large shareholders include BlackRock (BLK.N), Janus Capital Group (JNS.N) and T Rowe Price Group (TROW.O).

"If you get two of those three remaining shareholders, you get whatever board you can get that quorum to agree to," [Raymond James analyst Buck] Horne said. "You can install whomever you want. [Emphasis added.]

110.    At that time, *Reuters* also reported that the Board of the Company had issued a statement, taking the position that ***"Fairholme's statements and actions were not in the best interest of all St. Joe shareholders*…"   Conversely, defendant Berkowitz was then quoted in the same report as stating that, ***"[St.] Joe has the wrong business plan, ineffective governance and needs to stop wasting stockholder money*." [Emphasis added.]

111.    In the days that followed, the Board immediately took action to assure their entrenchment and adopted a "shareholder rights plan," or poison pill, designed to fend off a hostile bid by Fairholme.  Then, on February 16, 2011, the Board announced that it "adamantly opposes" a plan by executives of shareholder Fairholme to elect a new board.  That day, *Reuters* again reported, in part, the following:

Fairholme founder Bruce Berkowitz and President Charles Fernandez said today that they hired executive search firm Spencer Stuart and began soliciting investor approval to replace the developer's board, which currently has seven members….

"***St. Joe adamantly opposes Fairholme's efforts to obtain control of the company without paying a control premium to all other shareholders," the developer said in a statement today. If the executives "want to take control of St. Joe, they should make an offer to all shareholders to buy it," the company said.***

*    *    *

*Berkowitz has proposed a slate of board nominees including himself, Fernandez, Carnival Corp. Chief Operating Officer Howard Frank, and former Florida Governor Charlie Crist*….

"*St. Joe management plans must reflect business reality*," Berkowitz wrote in a letter to shareholders today. "*St. Joe management must stop selling cheap to fund wasteful spending*."

**Executive Compensation**

Chief Executive Officer William Britton Greene had total compensation of $2.8 million in 2009, when St. Joe reported a loss of $130 million on revenue of $138.3 million, according to the company and data compiled by Bloomberg.

\*   \*   \*

**Corporate Governance**

*The Fairholme executives said they would only be part of a board "where the majority of the directors are committed to shareholder value, pay for performance and effective corporate governance*," according to an e-mail to the board. "We have concluded that *the current board is not in a position to propose such a slate of directors*."  [Emphasis added.]

112.    On February 18, 2011, defendants caused the Company to file with the SEC pursuant to Form 8-K, a statement regarding the departures of Berkowitz and Fernandez.  The February 18, 2011 Form 8-K stated, in part, the following:

Item 5.02. Departure of Directors or Certain Officers; Election of Directors;

Appointment of Certain Officers; Compensatory Arrangements of Certain Officers. On February 14, 2011, Bruce R. Berkowitz and Charles M. Fernandez, members of the Board of Directors (the "Board") of The St. Joe Company ("St. Joe"), informed the Board of their decision to resign as members of the Board, effective immediately. Messrs. Berkowitz and Fernandez tendered their resignation from the Board in an email to the Board dated February 14, 2011, a copy of which is attached as exhibit 17.1 hereto and is incorporated by reference herein.

Following their joining the Board of St. Joe on January 1, 2011, Messrs. Berkowitz and Fernandez raised a number of matters regarding St. Joe's business strategy, management, corporate governance and compensation practices. Mr. Berkowitz discussed with management and the Board the level of St. Joe's spending, anticipated future losses, and whether the compensation structure properly aligns management's interests with those of the shareholders. Mr. Berkowitz also raised with the Board his views of St. Joe's corporate governance structure, including the composition of the

Board and management. The Board's Governance and Nominating Committee agreed with Mr. Berkowitz that the addition of new, highly-qualified independent directors was desirable and in the best interests of St. Joe and its shareholders. However, the Committee did not agree with him as to the most appropriate way to effect changes to the Board or management, or that those changes needed to be put in place earlier than the anticipated date of mailing in March 2011 of St. Joe's proxy statement for its annual meeting of shareholders.

113.     Only 10 days later, on February 28, 2011, defendant Greene and three of the Company's former Board members were caused to resign.  According to media reports, defendant Greene had resigned from the Board effective immediately, and would step down as President and CEO later that week, and that Michael L. Ainslie, John S. Lord and Walter L. Revell would also leave as directors.  In addition to the foregoing, at that time, defendants also announced that Berkowitz would re-join the Board, along with three other new members that included defendants Fernandez, Fairholme's President, Crist and Frank.  Defendants Durden, Fanning and Kesler would remain from the old board.  Following 10 consecutive quarters of losses, the Board also said it would cause the Company to hire an executive search firm to find at least one additional independent director.

114.     Furthering the plan that the Board protested only weeks before - - to acquire hegemony over the Company without offering shareholders any control premium - - on March 4, 2011, Berkowitz caused the Company to name him Chairman of the Board, and then to immediately remove any takeover defenses that would limit his ability to acquire more equity in St. Joe.  To reward his capitulation, defendant Durden, the outgoing Chairman of the Board, was named interim CEO,  while the Company recruited a replacement for defendant Greene.

115.     On April 11, 2011, the Company was caused to make an unscheduled announcement, that defendant McCalmont had resigned as Chief Financial Officer of the Company, and that the

Board would not seek a new CFO from outside St. Joe, but rather would elevate defendant Connolly to this position, from her previous role as Principle Accounting Officer.

116.     On July 1, 2011, *Reuters* reported hat the SEC had raised the level of its interest into St. Joe and that it had launched a formal "investigation" into the Company.   In part, Reuters reported the following:

**SEC launches investigation into St. Joe**

July 1 (Reuters) - St Joe Co said on Friday the U.S. Securities and Exchange Commission (SEC) was probing the real estate development company and it's chairman Bruce Berkowitz.

In January, the company disclosed that the SEC was conducting an informal inquiry into its policies relating to impairment of investment in real estate assets.

The company said it got a notice from the SEC on June 24 that it has issued a related order of private investigation.

***The investigation covers a variety of matters including anti-fraud provisions of the Federal securities laws, and compliance by holders of more than 5 percent of the company's stock with their reporting obligations under the agency's rules.***

                              *   *   *

***The SEC is also probing the company's internal controls, books and records, communications with auditors and financial reports***.

"The order designates officers of the SEC to take the testimony of the company and third parties with respect to any or all of these matters," St. Joe said in the filing…. [Emphasis added.]

117.     The following day, July 2, 2011, *Bloomberg* also reported that the SEC's formal investigation included Berkowitz as a subject of the probe.   *Bloomberg* reported, in part, the following:

**St. Joe, Chairman Bruce Berkowitz Are Subject of Formal Probe by U.S. SEC**

The U.S. Securities and Exchange Commission has started a formal investigation of St. Joe Co., Northern Florida's largest landowner, and Chairman Bruce Berkowitz, its biggest shareholder, the company said.

The probe "covers a variety of matters" including securities-law anti-fraud provisions for corporate officers and board members, internal controls and financial reports, the Watersound, Florida-based company said in a filing with the SEC made after the close of regular U.S. trading yesterday.

\* \* \*

**Documents and Testimony**

A formal investigation, such as the one St. Joe disclosed yesterday, enables the SEC to subpoena documents and testimony, according to the agency's enforcement manual.

118.     Following what defendant Berkowitz claimed was his decision to disclose that the SEC had stepped-up its investigation into the Company - - a full week after that had occurred - - shares of St. Joe collapsed - - falling $1.90 per share, or 9.1 percent, to $18.97.  For the Company, this amounted to the biggest drop in its share price since October 14, 2010, when Einhorn attacked the basis of its defendants' accounting for St. Joe's assets.  As a result of that decline, shares of the Company were then down 13 percent that year, compared with a 6.8 percent increase by the Russell 1000 Index.

119.     During the relevant period, as detailed herein, defendants engaged in a scheme to deceive St. Joe shareholders, and a course of conduct that artificially inflated St. Joe's stock price and operated as a fraud or deceit on relevant period purchasers of St. Joe's stock, by misrepresenting the Company's financial results by failing to record, in a timely manner, impairments to the Company's vast real estate holdings in North Western Florida..  Over a period of approximately 24 months, defendants improperly inflated the Company's financial results.  Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to St. Joe investors, shares of St. Joe declined precipitously – evidence that the prior artificial inflation in the price of St. Joe's shares was eradicated.  As a result of their purchases of St. Joe stock during

70

the relevant period, plaintiff and other Company shareholders suffered economic losses, *i.e.* damages under state and federal law.

120.    The decline in St. Joe's stock price at the end of the relevant period was a direct result of the nature and extent of defendants' deception, breach of fiduciary duty, and other misconduct being revealed to shareholders and to the market. The timing and magnitude of St. Joe's stock price decline negates any inference that the losses suffered by Plaintiff and other shareholders was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' misconduct.

121.    Defendants' false and materially misleading statements had the intended effect of causing St. Joe's shares to trade at artificially inflated levels throughout the Relevant Period – reaching a relevant period high of over $27.00 per share in May 2010.

122.    On October 13 and 14, 2010, however, as St. Joe shareholder learned the truth about the Company, and learned that defendants had failed to report the Company's financial and operational results, shares of the Company collapsed. These belated revelations had an immediate, adverse impact on the price of St. Joe shares. Similarly, in early July 2011, after investors learned that the SEC had upgraded the status of its investigation into St. Joe and defendant Berkowitz, shares of the Company also decline precipitously - - immediately falling almost 10%.

123.    These belated revelations also evidenced defendants' prior falsification of St. Joe's business prospects due to defendants' false statements made on behalf of the Company. As investors ultimately learned, the Company's asset values had been caused to be vastly overstated and its accounting for asset impairments understated. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from St. Joe's share price and were damaged as a result of the related share price decline.

## DERIVATIVE ALLEGATIONS

124.    Plaintiff brings this action derivatively in the right and for the benefit of St. Joe to redress injuries suffered, and to be suffered, by St. Joe as a direct result of the violations of state law, including breaches fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by defendants.

125.    St. Joe is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is and was a shareholder of St. Joe at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of St. Joe and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

126.    The wrongful acts complained of herein subject, and will continue to subject, St. Joe to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

127.    The wrongful acts complained of herein were unlawfully concealed from St. Joe's shareholders.

128.    Throughout the relevant period, the Defendants violated multiple Corporate Governance Principles, thus representing evidence of defendants' breaches of fiduciary duties.  The course of action related misrepresenting the financial integrity of the Company, and caused the defendants to breach the following Corporate Principles, among others:

(a)    The Board is elected by the stockholders to oversee the selection, retention and performance of the Chief Executive Officer, and to oversee management, and to assure that the long-term interests of the stockholders are being served; and

(b)    St. Joe actively promotes full, fair, accurate, timely, and understandable disclosure for use in any reports and documents that it files with, or submits to, the SEC and in other

public communications.  All Associates are expected to provide full, fair, accurate, timely, and understandable disclosure for use in such reports and documents.

## DEMAND FUTILITY

129.    Plaintiff has not made any demand on the Board of St. Joe to institute this action since such demand would be a futile and useless act because the wrongful acts complained of herein show a wholesale abandonment by defendants of their fiduciary duties of due care and oversight. Such abandonment includes, but is not limited to the following:

(a)    allowing insiders to dispose shares before news of the Company's financial woes became known to shareholders;

(b)    allowing the Company to become engaged in and/or suspected of potentially illegal and fraudulent activities;

(c)    allowing for materially inadequate controls over the Company's policies and practices with respect to accounting for inherent corporate value, goodwill, and asset valuations; and

(d)    allowing the Company's financial statements to be artificially inflated.

130.    These acts, and the other improper acts set forth herein, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

131.    Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  That doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden shifting, the business judgment rule is rebutted, and demand is not required.

132.    As detailed above, the Board members were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees, or they completely abdicated their responsibility to oversee the Company's operations and let management run roughshod over the Company for their personal gain and causing the Company to engage in illegal and/or improper conduct that rendered the Company's public disclosures misleading, destroying in their wake, much of the Company's shareholder value.  The Director Defendants' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

133.    In addition, defendant Greene will take no action against the remainder of the St. Joe Board, and they will take no action against him, because Defendant Greene was the CEO, Board member, and president and the person at St. Joe who dominated and controlled the Company during the majority of the relevant period

134.    Defendant Greene will also take no action against the other members of the Board of Directors because he, together with the other senior managers of St. Joe being sued herein, were directly responsible for the illegal acts and practices complained of herein, thus any pursuit demand upon the members of the Board of the Company to take the actions requested by Plaintiff herein must necessarily be excused.

135.    Moreover, by virtue of their respective positions on the Board, all the Defendants either knew of should have known about the Company's disregard for generally accepted accounting principles.  Therefore, a majority of the Board are either directly responsible for the Company's practices or were derelict in carrying out the express oversight duties with which they were charged.  As such, demand is excused as futile.

136.     Furthermore, defendants Frank (Chair), Fanning and Kessler, as the current members of the Audit Committee, and defendant Greene as President, CEO, and director of St. Joe during the relevant period were responsible for ensuring that the Company's internal controls over safety, compliance, and financial reporting were adequate and that the Company's quarterly and annual financial statements were accurate.   Thus, the Audit Committee was directly responsible for approving, and the President and CEO was a signature to, the Company's failure to comply with accounting principles and to issue materially false and misleading financial statements.   Therefore, there is significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their braches of fiduciary duties, including their duties of good faith, fair dealing and loyalty, as well as other violations of law.   As such, the defendants Greene, Fanning, Kesler and Frank are not disinterested or independent, and are not capable of responding adequately to a demand.   Demand on them is therefore excused.

137.     Indeed, the adoption of the Sarbanes-Oxley Act also placed significant additional responsibilities on the Board of Directors of St. Joe, to improve corporate financial, accounting and internal controls, and to improve corporate financial responsibility and disclosure.   Thus, despite the St. Joe Board's public posture of concern over good corporate governance, controls, disclosure integrity and overall compliance with the Sarbanes-Oxley act, in fact, at all relevant times, defendants had caused or allowed the falsification of the Company's reported financial results.   Any real compliance with Sarbanes-Oxley, however, would have exposed defendants' scheme, brought it to an end and resulted in embarrassing discharges.   Thus, the Board of St. Joe did not enforce or comply with Sarbanes-Oxley, despite its legal obligation under U.S. law to do so, and they will not now sue themselves for their failures to achieve such compliance.

138.    Moreover, while St. Joe and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and demand on them is therefore excused.

139.    In addition, and as a result of their concealments and falsifications, many of the directors and managers of St. Joe held onto their positions of power, prestige and profit at the Company.  The managers of St. Joe obtained millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

140.    Defendants Berkowitz and Fernandez are both currently affiliated with Fairholme Capital Management, L.L.C. and have a close social and personal relationship as a result of this ongoing experience, precluding them from acting independently of another.

141.    Defendants Berkowtiz and Fernandez are the Managing Member and President, respectively, of Fairholme Capital, L.L.C.  Advisory clients of Fairholme Capital Management hold approximately 29% of the outstanding shares of common stock of St. Joe.  Because the clients of Berkowitz and Fernandez are so intertwined with the Company, both Defendants are precluded from acting independently of one another.

142.    Defendants Greene and Crist are also affiliated with the social club known as Florida Council 100.  As a result, these defendants have close, social and personal relationships, precluding them from acting independently of another.

143.    Furthermore, the St. Joe Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of St. Joe or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)    The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)    In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who have personal relationships and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action; and

(e)    The members of the St. Joe Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of St. Joe. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are,

consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

144.     Demand must also be excused as to all of the members of the Board of Directors of the Company because each member of the Board either knew or was reckless or negligent in not knowing of the illegal and improper safety and disclosure practices that were sanctioned and approved at the Company throughout the Relevant Period.  The Director Defendants will not now take action against the other members of the Board of Directors of St. Joe because each of these defendants engaged in or allowed St. Joe to pursue prospective students via fraudulent means.

145.     Finally, demand is also excused because the Board has already failed, in the face of several investigative reports, to address the transactions challenged herein.  The Board has thus been made aware of the improper conduct and has failed to even investigate it.  This repeated resistance to correcting, or even investigating, improper conduct demonstrates that a demand on the Board to take action would be futile.

146.     Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.   Also, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling.  Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

147.     Moreover, each of the defendants, as an officer or director of St. Joe, had intimate knowledge of all major operations of the Company, and yet he participated in dissemination of material misstatements of the Company's financial information.   Thus, defendants all have a personal interest in concealing any blame for St. Joe's internal control problems, and away from himself for consciously disregarding fiduciary duties.  An investigation or inquiry that spread blame

higher up the corporate ladder — to the officers or directors — would not be in the personal interest of defendants.  The result of such an inquiry would require them to return valuable but unearned compensation to the Company.

148.     In addition, all defendants face a sufficiently substantial likelihood of liability, and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

149.     During the relevant period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its asset values, financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

150.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4 01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.  SEC Rule 13a 13 requires issuers to file quarterly reports.

151.     SEC Rule 12b 20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

152.    In addition, Item 303 of Regulation S K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year to date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

153.    Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past...

154.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year end adjustments even though they can be reasonably approximated at interim dates.  To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

155.    Statements of Financial Accounting Standards No. 5, Accounting for Contingencies ("FASB 5"), states that:

> An estimated loss from a loss contingency... shall be accrued by a charge to income if both of the following conditions are met:
>
>    a.    Information available prior to issuance of the financial statements indicates that an asset had been impaired or that a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss; and
>
>    b.    The amount of the loss can be reasonably estimated.

156.    Here, "information available prior to issuance" of the Company's financial statements and quarterly filings made during the relevant period indicated that "an asset had been impaired or that a liability had been incurred at the date of the financial statements." Defendants knew of, or recklessly or negligently disregarded, this information.

157.    Therefore, defendants were required to provide for the loss through a charge to income at the inception of the relevant period.  These financial statements and announcements were knowingly and recklessly and negligently false and misleading when made for the reasons stated herein.

158.    The Company's financial statements were caused to contain reports filed with the SEC on Form(s) 10-Q and Form(s) 10-K for the quarterly and year-end periods, throughout the relevant period, were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

    (a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)      The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)      The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)      The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)      The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the financial statements (APB Opinion No. 22).

(g)      The principle that losses be accrued for when a loss contingency exists (Statement of Financial Accounting Standards No. 5).

(h)      The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is at| least a reasonable possibility that a loss or an additional loss may have been incurred (Statement of Financial Accounting Standards No. 5).

(i)      The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(j)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies j have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(k)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

159.    In addition, during the relevant period, defendants violated SEC disclosure rules:

(a)     defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S X, 17 C.F.R. ' 210.4 01(a)(1).

160.    Defendants were required to disclose in the Company's financial statements the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.  Defendants, however, caused the Company to fail to make such disclosures, and to account for and to report St. Joe's financial statements in conformity with GAAP.  Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the relevant period, were materially false and misleading for the reasons set forth herein.

161.    In fact, as shareholders ultimately learned as a result of the market's reaction to the belated disclosures which were eventually made about the Company, had its' true financial position and results of its' operations been disclosed during the relevant period, St. Joe's common stock would have traded at much lower prices.

## COUNT I

### Derivatively Against All Defendants for Breach of Fiduciary Duty

162.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

163.    Defendants owed and owe St. Joe fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe St. Joe the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

164.    Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

165.    Each of the defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166.     Defendants caused or allowed St. Joe to lack requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions, manipulated facts, and/or fraudulent accounting practices.

167.    Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

168.    Defendants caused or allowed financial statements to be materially misstated.

169.     Defendants caused or allowed St. Joe's relevant period financial statements, specifically the Company's goodwill, to be materially misleading and not prepared in accordance with GAAP principles.

170.     As a direct and proximate result of the defendants' failure to perform their fiduciary obligations, St. Joe has sustained significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT II**

**Derivatively Against All Defendants for Abuse of Control**

171.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

172.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence St. Joe, for which they are legally responsible. Among the abuses of control was: (i) defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving proper accounting of the Company's financial operations and (ii) defendants' reckless and/or grossly negligent failure to properly utilize corporate wide stress tests to determine whether or not the Company's stated financials were properly accounted for in accordance with the Company's policies.

173.     As a direct and proximate result of defendants' abuse of control, St. Joe has sustained significant damages.

174.     As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT III**

**Derivatively Against All Defendants for Gross Mismanagement**

175.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

85

176.    By their actions alleged herein, defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of St. Joe in a manner consistent with the operations of a publicly held corporation.

177.    Defendants caused or allowed St. Joe to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated accounting procedures.

178.    Defendants caused or allowed the Company's financial statements to be materially misstated due to the Defendants' failure to properly account for the Company's real estate holdings and other financial measurements.

179.    Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company financial statements, as well as the Company's safety and compliance practices.

180.    Defendants caused or allowed financial statements to be materially misstated.

181.    Defendants, including members of the Audit and Financial Committee, did not take seriously their primary responsibility for the Company's safety, compliance, and financial reporting activities.

182.    As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, St. Joe has sustained significant damages in excess of hundreds of millions of dollars.

183.    As a result of the misconduct and breaches of duty alleged herein, the defendants are liable to the Company.

## COUNT IV

### Derivatively Against All Defendants for Waste of Corporate Assets

184.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

185.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the defendants have caused St. Joe to waste valuable corporate assets by paying incentive-based bonuses to certain of its executive officers and to repurchase its stock on the open market at inflated prices. In addition, they have caused St. Joe to incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

186.     As a result of the waste of corporate assets, defendants are liable to the Company.

## COUNT V

### Derivatively Against All Defendants for Unjust Enrichment

187.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

188.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of St. Joe.  While these defendants received millions of dollars of largesse, the Company's market-capitalization was eviscerated.

189.     In addition, defendants, by virtue of their misconduct, usurped millions of dollars in unearned bonus, salaries, stock awards, and other emoluments.

190.     Plaintiff, as a shareholder and representative of St. Joe, seeks restitution from the defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the defendants, and each of them, from their wrongful conduct and fiduciary breaches.

191.    Plaintiff on behalf of St. Joe has no adequate remedy at law

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of St. Joe have an effective remedy;

C.      Awarding to St. Joe restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by defendants;

D.      Directing St. Joe to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect St. Joe and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies, including measures to:

(i)     Strengthen the Board's supervision of operations and accounting procedures and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)    Permit the shareholders of St. Joe to nominate at least three candidates for election to the Board; and

        (iii)     Appropriately test and then strengthen the internal audit and control functions demanded herein.

        E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

        F.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 12, 2011        /s/ *Christopher S. Jones*
                           Joseph E. White III (Florida Bar # 0621064)
                           Christopher S. Jones (Florida Bar # 306230)
                           Jonathan M. Stein (Florida Bar # 009784)
                           Lester R. Hooker (Florida Bar # 0032242)
                           Brandon T. Grzandziel (Florida Bar#0058732)
                           **SAXENA WHITE P.A.**
                           2424 N. Federal Highway, Suite 257
                           Boca Raton, FL 33431
                           Telephone: (561) 394-3399
                           Facsimile: (561) 394-3382

                           **KAHN SWICK & FOTI, LLC**
                           Albert M. Myers (*pro hac vice* application to be filed)
                           albert.myers@ksfcounsel.com
                           Melinda A. Nicholson (*pro hac vice* application to be filed)
                           melinda.nicholson@ksfcounsel.com
                           206 Covington Street
                           Madisonville, Louisiana 70447
                           Telephone: (504) 455-1400
                           Fax: (504) 455-1498

                           *Attorneys for Plaintiff David Shurkin*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 12, 2011, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system.

*/s/ Christopher S. Jones*
Christopher S. Jones

## **VERIFICATION**

I, Albert M. Myers, aver under penalty of perjury of the United States that, as counsel for plaintiff, Richard Shurkin, I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations are true and correct to the best of my knowledge and belief.

_____
Albert M. Myers